PASSAIC VALLEY SEWERAGE
COMMISSIONERS,
Petitioner,

v.

UNITED STATES DEPARTMENT OF
LABOR and Robert Reich, the Secretary
of Labor, Respondents.

No. 92–3261.

United States Court of Appeals,
Third Circuit.

Argued Jan. 7, 1993.

Decided April 16, 1993.

Gabriel M. Ambrosio, (argued), Law Office of Gabriel M. Ambrosio, Lyndhurst, NJ, for petitioner.

Marshall J. Breger, Sol. of Labor (argued), Allen H. Feldman, Associate Sol. for Sp. Appellate and Supreme Court Litigation, Steven J. Mandel, Deputy Associate Sol., William J. Stone, Ellen L. Beard, and Paul L. Frieden, U.S. Dept. of Labor, Washington, DC, for respondents.

Before: MANSMANN and NYGAARD, Circuit Judges, and DALZELL, District Judge.[*]

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

The Passaic Valley Sewerage Commissioners petition for a review of a Final Order of the Secretary of Labor[1] which set aside a Recommended Decision and Order of the Administrative Law Judge, and held the PVSC liable in equity and for damages for the wrongful discharge of an employee under the Federal Water Pollution Control Act's "whistle-blower" employee protection provision.

The primary issues before us are whether the employee's activity, which consisted of his repeated intracorporate complaints regarding the PVSC's operating practices, is protected under the whistle-blower provision, and if so, whether his employment termination was in retaliation for his pattern of complaints so as to implicate the PVSC under that statute. We hold that the administrative interpretation of the statute as being protective of this employee's intracorporate complaints comports with the broad remedial purpose of the statute and is hence permissible. Because the Secretary's finding of retaliatory employment termination is supported by substantial evidence, we will affirm the Secretary's remedial orders.

### I.

The Passaic Valley Sewerage Commissioners, a corporate and political organization under New Jersey state law,[2] successfully operate a modern secondary sewage treatment plant.[3] Federal appropriations pursuant to an Environmental Protection Agency allotment under § 202 of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (commonly known as the Clean Water Act),[4] provided 75% of the plant's construction costs, bringing the PVSC operations under the Clean Water Act regulations which condition federal funding.

The Clean Water Act requires recipients of federal funds to adopt a system of billing or

---

[*] Honorable Stewart Dalzell of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

1. At the time the Final Order of the Secretary of Labor was issued Lynn Martin served as the Secretary of Labor. We have changed the caption to reflect automatic substitution of the named public officer pursuant to Fed.R.App.P. 43(c).

2. N.J.S.A. 58:14-1 *et seq.*

3. A secondary treatment plant removes over 90% of pollutants from waste material, whereas a primary treatment facility removes 10 to 15% of pollutants. Brief of PVSC at p. 5, n. *.

4. This Act authorizes the EPA to make federal grants to state and local governmental agencies to fund construction of publicly owned waste treatment plants. 33 U.S.C. §§ 1281–1299.

customer user charges which "assure[s] that each recipient of waste treatment services within the applicant's jurisdiction ... will pay its proportionate share ... of the costs of operation and maintenance (including replacement) of any waste treatment services provided by the applicant." 33 U.S.C. § 1284(b)(1)(A). In compliance with this requirement, the PVSC instituted an *ad valorem* user charge system,[5] purportedly approved by the EPA after numerous public hearings, whereby the PVSC charged users on the basis of the volume of waste water discharged to the system and the concentration of dissolved and undissolved solids to be treated. 40 C.F.R. § 35.929–1(a). The PVSC implements its user charge system via customer self-monitoring, which requires that each industrial user sample, monitor and report on its waste water discharges to the PVSC Treatment Works, subject to the PVSC's periodic compliance checks. The self-monitoring process requires that in addition to its regular sampling procedure, industrial users prepare a daily split sample, making one sample available to the PVSC to collect and perform its own evaluation of the accuracy of the self-monitored data.

In August of 1981, Joseph Guttman, the PVSC's Chief of Laboratory and Stream Pollution Control, became highly critical of the split-sampling procedure. He remained critical of the procedure for the duration of his tenure at the PVSC. The gist of Guttman's complaints was that the system was allegedly inordinately expensive, inefficient, scientifically unreliable and in violation of the Clean Water Act user charge provisions. His initial written complaint was conveyed in a memorandum to his superior, the PVSC's Chief Engineer Ricci, and included a recommendation for increased PVSC oversight of sample preparation. The following year Guttman repeated his complaints in writing to the Chief of Industrial Waste D'Ascensio. Again that year, Guttman wrote to Executive Director Perrapato expressing his dissatisfaction and requesting an increased supervisory role for himself. Perrapato apprised all of the individual PVS commissioners of Guttman's concerns, and obtained, from in-house legal counsel, recommendations on the issues Guttman raised. When counsel assured the PVSC that full compliance with the Clean Water Act was maintained, the PVSC considered the matter closed. With the commissioners' approval, Perrapato assigned D'Ascensio to supervise Guttman.

The working relationship between Guttman and D'Ascensio was, from the start, extremely volatile and their mutual antipathy became exacerbated when Guttman began unilaterally to discard large numbers of split samples collected by the PVSC. While Guttman insisted that allegedly poor or unreliable quality and an harassingly excessive quantity of these samples justified this practice, D'Ascensio characterized the practice as a deliberate attempt to sabotage the user charge system, prompting D'Ascensio to prepare a highly critical evaluation of Guttman's performance, which implied the possibility of imminent negative impact on Guttman's employment. In the ensuing weeks, Guttman prepared a memorandum which he circulated to all the PVS commissioners, generally alleging Clean Water Act violations against the PVSC's user charge verification system. In response to in-house counsel's request for greater legal and factual specificity in the allegations, Guttman issued a second memorandum citing "204(b)(1)(A)" [33 U.S.C. § 1284(b)(1)(A) ] of the Clean Water Act.

Although in-house counsel rebutted each of Guttman's allegations, the PVSC afforded Guttman the opportunity to brief the panel of commissioners. On the basis of that hearing and on the advice of in-house counsel, the commissioners found Guttman's claims to be without merit. In the course of the hearing, Guttman stated that in a telephone discussion with Ambrosio, the PVSC in-house counsel, Guttman threatened to report his claim directly to the EPA. Ambrosio did not recollect this alleged threat and testified that, under the circumstances, he would not have

---

5. PVSC's *ad valorem* user charge system was developed by PVSC personnel, including Chief Engineer Rocco Ricci, Chief of Industrial Waste Frank D'Ascensio, Chief Financial Officer Vincent Gialorenzo, and Assistant Counsel Gabriel Ambrosio, in conjunction with the accounting firm of Arthur Young & Company.

taken the alleged threat seriously had it occurred.

Upon these occurrences and a determination that Guttman's behavior jeopardized the PVSC's credibility with its customers, D'Ascensio recommended termination of Guttman's employment. Perrapato immediately assigned Personnel Managers Santamassino and Borgatti to mediate the dispute between Guttman and D'Ascensio. Approximately six months later, pursuant to Santamassino's recommendation which Perrapato transmitted to the commissioners, the PVSC eliminated Guttman's position of Chief of Laboratory as no longer necessary after a corporate reorganization in which four departments were collapsed into three. Guttman became the only Chief terminated, effective November 10, 1984. The termination decision was purportedly made strictly upon the fiscal needs of the PVSC and Guttman's lack of seniority, and "ha[d] nothing to do with individual personalities." Perrapato Memorandum dated September 6, 1984.

Although there is evidence which supports the proffered reason for Guttman's employment termination, there is substantial evidence that indeed Guttman's apparent lack of interpersonal skills contributed to his selection for employment termination. Of most specific concern to us is whether Guttman's layoff was a retaliatory measure, as Guttman claims, aimed at punishing protected but disruptive activity under § 507 of the Clean Water Act, the Act's provision protecting "whistle-blowers." The Administrative Law Judge[6] recommended denying Guttman's claim on the basis that his complaints were "internal" with but one allegation that Guttman threatened to communicate directly with

the EPA. The Administrative Law Judge reasoned that internal complaints are not protected activity under the whistle-blower statute, and concluded that there was no cause and effect nexus between Guttman's alleged threat to take his claim to the EPA and his subsequent employment termination. Noting that "even assuming, *arguendo*, that the Commissioners knew or suspected that Claimant had any intention of taking his views public, an elegant sufficiency of time had passed during which Claimant had taken no action whatsoever so as to indicate any threat was empty and inconsequential." Recommended Decision and Order Denying Claim, April 17, 1985. The Administrative Law Judge found that the termination was squarely within the employer's discretion in managing employee relationships, and was not in retaliation for Guttman's complaints of alleged violations of the Clean Water Act.

On March 13, 1992, seven years after the Administrative Law Judge issued the Recommended Decision and Order denying plaintiff's claim, the Secretary of Labor reversed that dismissal in a Final Decision and Order, concluding that the PVSC had violated the employee protection provision of the Clean Water Act, and awarding reinstatement, backpay and benefits with interest.[7]

We must decide whether the Secretary of Labor's conclusion that Guttman's intracorporate complaints have protected status under § 507(a) of the Clean Water Act is reasonable, and if so, whether there is substantial evidence to support the Secretary's findings that Guttman was discharged in violation of that whistle-blower provision. We

---

**6.** Under the regulations which provide for the procedural implementation of the whistle-blower statute, the Department of Labor's Wages and Hour Division conducts the initial investigations pursuant to the filing of an employee complaint, and the Department's Office of Administrative Law Judges holds related hearings. 29 C.F.R. §§ 24.3, 24.4, 24.5. The Secretary of Labor reviews the recommendations of the ALJ, and then issues his or her own final decision and order. 29 C.F.R. § 24.6.

**7.** Section 24 of Volume 29 of the Code of Federal Regulations sets out the "procedures for the handling of discrimination complaints under federal employee protection statutes." 29 C.F.R. § 24.1

*et seq.* Section 24.6(b)(1) provides that "within ninety (90) days after receipt of a complaint, the Secretary of Labor shall issue a final order...." Here, the Secretary issued a final order years after the 90-day time frame. The parties did not initiate an action to compel the Secretary to issue its decision, however, and no allegation of prejudice from the delay is asserted. *See Roadway Express, Inc. v. Dole*, 929 F.2d 1060, 1066–67 (5th Cir.1991) (failure to comply with regulatory time limits does not result in loss of jurisdiction unless statute expressly requires timely action and states a consequence for failing to comply).

assume jurisdiction pursuant to 33 U.S.C. §§ 1367(b) and 1369(b).

We exercise plenary review over legal questions concerning the construction of statutes which an agency administers where Congress has unambiguously addressed the question at issue. Federal Administrative Procedures Act, 5 U.S.C. §§ 704, 706. Here, however, we find the facial language of the Clean Water Act's whistle-blower protection provision to admit of more than one interpretation, and hence we are compelled to uphold the Secretary's interpretation if it is "based on a permissible construction of the statute." *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). The Secretary's conclusion from the facts, if reasonable and supported by substantial evidence, will likewise be upheld in accordance with the federal Administrative Procedure Act, 5 U.S.C. § 706(2)(E). We turn first to the legal question of whether an employee who makes intracorporate complaints is protected under the Clean Water Act's whistle-blower provision.

## II.

Section 507(a) of the Clean Water Act provides that:

> No person shall fire, or in any other way discriminate against ... any employee ... by reason of the fact that such employee ... has filed, instituted, or caused to be filed or instituted any proceeding under this chapter, or has testified or is about to testify in any proceeding resulting from the administration or enforcement of the [Clean Water Act].

33 U.S.C. § 1367(a).

Such "whistle-blower" provisions are intended to promote a working environment in which employees are relatively free from the debilitating threat of employment reprisals for publicly asserting company violations of statutes protecting the environment, such as the Clean Water Act and nuclear safety statutes. They are intended to encourage employees to aid in the enforcement of these statutes by raising substantiated claims through protected procedural channels. The parties are in agreement here that

complaints registered with a competent enforcement organ of government, external to the federal fund recipient, in order to initiate a formal proceeding, are covered by this provision. The specific question before us is whether Guttman's *intracorporate* complaints, including his memoranda and testimony before the PVSC, are also covered.

The statutory term "proceeding" within § 507(a) of the Clean Water Act is ambiguous. The term may reasonably be invoked to encompass a range of complaint activity of varying degrees of formal legal status. The Secretary held that an employee's exclusively intracorporate complaint reporting is an activity fully protected under the terms of the provision. The Secretary further held that whether the employee was profoundly misguided or insufficiently informed in his assessment of the PVSC's user charge system was irrelevant, and that the Administrative Law Judge had erred as a matter of law in excluding ill-formed complaints from protection. Final Decision and Order of the Secretary, dated March 13, 1992.

We believe that the statute's purpose and legislative history allow, and even necessitate, extension of the term "proceeding" to intracorporate complaints. The whistle-blower provision was enacted for the broad remedial purpose of shielding employees from retaliatory actions taken against them by management to discourage or to punish employee efforts to bring the corporation into compliance with the Clean Water Act's safety and quality standards. If the regulatory scheme is to effectuate its substantive goals, employees must be free from threats to their job security in retaliation for their good faith assertions of corporate violations of the statute. Section 507(a)'s protection would be largely hollow if it were restricted to the point of filing a formal complaint with the appropriate external law enforcement agency. Employees should not be discouraged from the normal route of pursuing internal remedies before going public with their good faith allegations. Indeed, it is most appropriate, both in terms of efficiency and economics, as well as congenial with inherent corporate structure, that employees notify management of their observations as

to the corporation's failures before formal investigations and litigation are initiated, so as to facilitate prompt voluntary remediation and compliance with the Clean Water Act. Where perceived corporate oversights are a matter of employee misunderstanding, this would afford management the opportunity to justify or clarify its policies. *See Sullivan v. Massachusetts Mut. Life Ins. Co.,* 802 F.Supp. 716, 725 (D.Conn.1992). Moreover, an employee's non-frivolous complaint should not have to be guaranteed to withstand the scrutiny of in-house or external review in order to merit protection under § 507(a) for the obvious reason that such a standard would chill employee initiatives in bringing to light perceived discrepancies in the workings of their agency.

Furthermore, the whistle-blower provision of the Clean Water Act mirrors that of several other federal environmental, safety and energy statutes.[8] The legislative history of § 507 indicates that it was patterned after some of these provisions. S.Rep. No. 414, 92d Cong., 2d Sess. 83 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3748. Construing such a whistle-blower statute, the Supreme Court has afforded broad protection to employees, noting that broad protection is necessary " 'to prevent the Board's channels of information from being dried up by employer intimidation of prospective complainants and witnesses.' " *NLRB v. Scrivener,* 405 U.S. 117, 122–23, 92 S.Ct. 798, 801–02, 31 L.Ed.2d 79 (1972) (citing *John Hancock Mut. Life Ins. Co. v. NLRB,* 191 F.2d 483, 485 (D.C.Cir.1951)) ("testimony" under the National Labor Relations Act's whistle-blower provision includes sworn statement of em-

ployee to investigator which was not later used at formal hearing).

Similarly, our sister courts of appeals have consistently construed those statutes to lend broad protective coverage to internal complainants, as well as other employees. *See, e.g., Mackowiak v. University Nuclear Systems, Inc.,* 735 F.2d 1159, 1163 (9th Cir.1984) (internal safety and quality control complaints protected under Energy Reorganization Act of 1974); *NLRB v. Retail Store Employees Union,* 570 F.2d 586 (6th Cir.), *cert. denied,* 439 U.S. 819, 99 S.Ct. 81, 58 L.Ed.2d 109 (1978) (employee who refused to testify in support of union protected under the National Labor Relations Act); *Phillips v. Interior Board of Mine Operations Appeals,* 500 F.2d 772, 779 (D.C.Cir.1974), *cert. denied,* 420 U.S. 938, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975) (coal miner's "notification to the foreman of possible dangers" protected activity under Federal Coal Mine Health and Safety Act of 1969); *Kansas Gas & Elec. Co. v. Brock,* 780 F.2d 1505, 1510–12 (10th Cir.1985), *cert. denied,* 478 U.S. 1011, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986) (protection under Energy Reorganization Act's whistle-blower provision); *Consolidated Edison Co. v. Donovan,* 673 F.2d 61 (2d Cir.1982) (Energy Reorganization Act); *Rayner v. Smirl,* 873 F.2d 60, 64 (4th Cir.), *cert. denied,* 493 U.S. 876, 110 S.Ct. 213, 107 L.Ed.2d 166 (1989) (Federal Railroad Safety Act); *Pogue v. United States Dept. of Labor,* 940 F.2d 1287, 1289 (9th Cir.1991) (whistle-blower provisions of four separate environmental statutes); *Love v. RE/MAX of America, Inc.,* 738 F.2d 383, 387 (10th Cir.1984) (Fair Labor Standards Act); *but see Brown & Root, Inc. v. Donovan,* 747 F.2d 1029 (5th Cir.1984) (internal complaints are not protected by whistle-blower provision of the Energy Reor-

---

**8.** *See, e.g.,* 42 U.S.C. § 7622 (Clean Air Act); 42 U.S.C. § 9610 (Comprehensive Environmental Response, Compensation, and Liability Act); 42 U.S.C. § 300j–9(i) (Safe Drinking Water Act); 42 U.S.C. § 6971 (Resource Conservation and Recovery Act); 15 U.S.C. § 2622 (Toxic Substances Control Act); 42 U.S.C. § 5851 (Energy Reorganization Act); 30 U.S.C. § 815(c)(1) (Federal Mine Safety and Health Act); 29 U.S.C. § 158(a)(4) (National Labor Relations Act); 45 U.S.C. § 441(a) (Federal Railroad Safety Authorization Act).

The Senate Report on the Energy Reorganization Act's whistle-blower provision, for example, states:

This amendment is substantially identical to provisions in the Clean Air Act and the Federal Water Pollution Control Act. The legislative history of those acts indicated that such provisions were patterned after the National Labor Management Act and a similar provision in Public Law 91–173 [Federal Mining Safety Act] relating to the health and safety of the Nation's coal miners.

S.Rep. No. 848, 95th Cong., 2d Sess. at 29, *reprinted in* 1978 U.S.C.C.A.N. at 7303.

ganization Act).[9] Although the present case is the first to present us with this issue in the context of the Clean Water Act, the weight of other circuits' precedent reviewing analogous statutes concurs with the Secretary's own broad inclusion of intracorporate complaints within the protective scope of the statute.

We hold that the Secretary's interpretation of the statute gives effect to the intent of Congress. The statute's legislative intent, supported by federal decisions, reasonably permits a broad interpretation of the term "proceeding" within § 507(a) of the Clean Water Act to include intracorporate complaints. Under *Chevron,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), we will defer to the Secretary's reasonably permissible construction. The Secretary's holding that all good faith intracorporate allegations are fully protected from retaliation under § 507(a) will be affirmed.

Because the Secretary was reasonable in concluding that intracorporate complaints are protected under the statute, our opinion does not turn on whatever Guttman's alleged one time threat to pursue his complaint directly with the EPA adds to the weight of the evidence. *See* Recommended Decision and Order of the Administrative Law Judge at 2. Nor does our opinion turn on whether Guttman's testimony before the PVSC qualifies as an external formal "proceeding" within the meaning of the Clean Water Act on the basis that the PVSC is a competent organ of government to process environmental complaints

pursuant to New Jersey law. N.J.Stat.Ann. §§ 58:14–7; 58:14–8; 58:14–35. *See* Brief for the Secretary of Labor at 29–30. Guttman's internal complaints fall within the protective scope of § 507(a), and the only remaining question is whether there is substantial evidence in the record to support the Secretary's finding of retaliatory discharge.

### III.

■ Section 706 of the Administrative Procedure Act requires a court to set aside an agency decision which is not supported by substantial evidence. 5 U.S.C. § 706(2)(E). "Substantial evidence" is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). Substantial evidence is "more than a mere scintilla," *id.,* but "less than the weight of the evidence," *Consolo v. Federal Maritime Com.,* 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). *See also Broome v. United States Dept. of Labor,* 870 F.2d 95, 102 (3d Cir.1989).

■ Guttman's evidentiary burden to demonstrate a prima facie case of retaliatory discharge under § 507(a) consists in his showing that (1) the plaintiff was an employee of the party charged with discrimination;

9. The whistle-blower provision at issue in *Brown & Root, Inc.,* § 210(a) of the Energy Reorganization Act, 42 U.S.C. § 5851(a), provided that:

No employer ... may discharge any employee ... because the employee ...—
(1) commenced ... a proceeding under this chapter or the Atomic Energy Act of 1954 ... or ... for the administration or enforcement of any requirement imposed under this chapter ...;
(2) testified ... in any such proceeding or;
(3) assisted or participated ... in such a proceeding ... or in any other action to carry out the purposes of this chapter....

The court of appeals interpreted this section as solely protecting from retaliation "corporate 'whistle blowers' who inform responsible officials of corporate failings," and did not extend protection to employees who file "purely internal quality control reports." 747 F.2d at 1031. The court reasoned that the statutory language of the whistle-blower provision, taken in isolation as

well as in the context of the other provisions of the Energy Reorganization Act, did not provide a basis for construing the terms "proceeding" or "action" broadly enough to encompass internal complaints.

The court noted that the Secretary did not argue that filing internal quality control reports constituted initiation of a "proceeding," which, the court remarked, connotes a formal legal or administrative act, but rather, the Secretary argued that the internal filings represented the "other action" protected under § 5851(a). The court was not persuaded by the Secretary's argument. *Brown & Root, Inc.,* 747 F.2d at 1031–32.

As a policy matter, the court was concerned that a broad interpretation of the statutory terms would defy containment and would logically extend the Department of Labor's oversight into the discretionary domain of corporate management in the mediation of employer/employee relations.

(2) the plaintiff was engaged in a protected activity under the Clean Water Act; (3) the employer took an adverse action against the plaintiff; and (4) the evidence created a reasonable inference that the adverse action was taken because of the plaintiff's participation in the statutorily protected activity. *See Couty v. Dole,* 886 F.2d 147, 148 (8th Cir. 1989) (Energy Reorganization Act); *Lockert v. U.S. Dept. of Labor,* 867 F.2d 513, 519 (9th Cir.1989) (Energy Reorganization Act and National Labor Relations Act); *De Ford v. Secretary of Labor,* 700 F.2d 281, 286 (6th Cir.1983) (Energy Reorganization Act).

The first and third elements are undisputed. We have resolved the second element in favor of Guttman in this opinion, leaving only the question of a sufficient nexus between the PVSC's adverse action and Guttman's pattern of internal complaints. Even if the evidence raises a reasonable inference of retaliatory discharge, the PVSC may rebut the inference by proving a legitimate, non-discriminatory, non-pretextual reason for its action. Where evidence of "dual motive" exists, i.e., where reasons other than retaliation may also account for the employee's termination with his employer, the employer has the burden to prove by a preponderance of the evidence that it would have terminated the employee even if the employee had not engaged in the protected conduct. *Mt. Healthy City School Dist. Bd. of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Mackowiak,* 735 F.2d at 1163–64; *Consolidated Edison,* 673 F.2d at 62–63.

The Secretary determined that Guttman was engaged in protected activity, that such activity was the direct cause of his employment termination, and that the PVSC's proffered rebuttal was merely a pretext for the unlawful discharge. Final Decision and Order of the Secretary.

We hold that substantial evidence supports the Secretary's finding that Guttman's complaint activity directly prompted the PVSC to terminate his employment, and was the dominant reason for the PVSC's employment decision even though other alleged reasons, such as corporate economy of resources and Guttman's alleged incom-

petence, may have also played a role. The record indicates that management believed that Guttman's activity jeopardized the entire user charge system and compromised the PVSC's customer credibility. Guttman's memorandum of March, 1984, alleging Clean Water Act violations, did precipitate adverse action by the PVSC, namely a recommendation that Guttman be terminated. The corporate reorganization which eliminated Guttman's office was recommended in writing in September of that same year, only six months after Guttman's March memo, and only four months after Guttman's testimony before the PVSC in May. Furthermore, Ambrosio testified under oath that Guttman's complaints "probably had a connection" to his subsequent layoff. Although it is possible to weigh the facts of record differently, we are bound by our standard of review. A reasonable mind might very well accept as adequate the evidence on record to support the Secretary's conclusion. *Richardson,* 402 U.S. at 401, 91 S.Ct. at 1427. There is certainly more than a scintilla of evidence supporting Guttman's claim.

The Secretary found that the "reorganization recommendation had at least something, if not everything, to do with Complainant's personality, which was principally manifested by his highly vocal and unyielding objections to Respondent's user charge system." Final Decision and Order of the Secretary, dated March 13, 1992, at 17. The Secretary's finding, that the PVSC's proffered fiscal reasons and poor job performance to account for Guttman's layoff were insufficient to meet the PVSC's burden of production to rebut Guttman's prima facie case, comports with a reasonable interpretation of the factual evidence in this case. We have reviewed this evidence and conclude that it permits the conclusion that any alleged "personality" problem or deficiency of interpersonal skills was reducible in essence to the problem of the inconvenience Guttman caused by his pattern of complaints. There is no evidence before us that Guttman's alleged personality or professional deficiencies arose in any other context outside of his complaint activity.

With regard to evidence of dual motive, the Secretary correctly noted that under this

theory, it is the *employer's* motivation which is under scrutiny. The PVSC's evidence fails to separate its legitimate rationale from its prohibited rationale in its termination of Guttman, and thus does not prove its decision *would* have been the same absent Guttman's history of complaints. It is not enough that the evidence proved that the PVSC *could* have in retrospect made its employment decision on legitimate grounds. As already noted, the only context in which the PVSC has cited Guttman as inadequate has been related to his complaints regarding the user charge system. The risk that the illegal and legal motives behind employee termination merge and become inseparable is placed on the employer. *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983); *Mackowiak*, 735 F.2d at 1164. Because the Secretary reasonably concluded on the basis of the substantial evidence that the PVSC had not proved a preemptive legitimate reason for discharging Guttman, we hold that the PVSC is not relieved from liability under the theory of dual motive.

We do not believe that our holding here compromises the ability of management to exercise broad discretion in the regulation of employer/employee relations. The whistleblower statute is sufficiently framed so as to target precisely the identified harmful activity without substantial threat to management's reasonable latitude in employment decisions. The substantial evidence here supports the Secretary's findings that Guttman's discharge violated the whistle-blower provision of the Clean Water Act.

## IV.

For the foregoing reasons, we will affirm the Final Decision and Order of the Secretary of Labor dated March 13, 1992, reinstating Guttman and awarding back pay, including the benefits and interest to which Guttman is entitled pursuant to that Order.