USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-2083

 CLEAN HARBORS ENVIRONMENTAL SERVICES, INC.,

 Petitioner,

 v.

 ALEXIS M. HERMAN, SECRETARY, 
 UNITED STATES DEPARTMENT OF LABOR
 
 Respondent, and
 
 THOMAS DUTKIEWICZ,
 
 Intervenor.
 

PETITION FOR REVIEW OF THE FINAL DECISION AND ORDER

OF THE ADMINISTRATIVE REVIEW BOARD OF

 THE UNITED STATES DEPARTMENT OF LABOR
 

 Before
 
 Torruella, Chief Judge,
 
 Stahl and Lynch, Circuit Judges.
 

 Gary S. Matsko, with whom Judith Ashton and Davis, Malm &
D'Agostine, P.C. were on brief, for petitioner.
 Barbara Werthmann, Counsel for Appellate Litigation, with whom
Marvin Krislov, Deputy Solicitor for National Operations, Joseph M.
Woodward, Associate Solicitor for Occupational Safety and Health,
and Barbara A.W. McConnell, Attorney, U.S. Department of Labor,
were on brief, for respondent. 
 Thomas M. Dutkiewicz, on brief pro se.

June 10, 1998

 LYNCH, Circuit Judge. Thomas Dutkiewicz was fired by his
employer, Clean Harbors Environmental Services, Inc., after he
repeatedly complained he felt his supervisors were pressuring him
to violate Department of Transportation ("DOT") regulations for
hauling hazardous materials, and that he would not do that. The
company said he was fired because customers complained about his
abrasive manner. Dutkiewicz complained to the company that he had
been unfairly and unlawfully terminated. The company rehired
Dutkiewicz for a different position, kept him on a short leash, and
fired him three months later.
 Dutkiewicz filed a complaint with the U.S. Department of
Labor under the employee protection provisions of the Safety
Transportation Assistance Act of 1982 ("STAA"), 49 U.S.C. 31105,
claiming both his employment terminations were in retaliation for
his safety complaints and his refusal to violate federal
regulations. The Administrative Law Judge ("ALJ"), in a
recommended decision and order, found in favor of Dutkiewicz and
awarded back pay, reinstatement, and compensatory damages. The
Administrative Review Board ("ARB") affirmed the ALJ's
recommendation and also upheld the damages award. Clean Harbors
petitions for review to this court, raising one pure issue of law
and arguments that the ARB decision is not supported by substantial
evidence.
 When an employee has "filed a complaint or begun a
proceeding," the STAA, 49 U.S.C. 31105(a)(1)(A), protects that
employee from retaliatory adverse employment actions. The question
of law, one of first impression in this court, is whether this
section protects an employee who has filed purely intracorporate
complaints about alleged violations of federal law. We agree with
the ARB's interpretation that it does. We also find that
substantial evidence supports the ARB's findings that Dutkiewicz in
fact "filed" such internal complaints, and that his employment
terminations were causally related to that protected activity.
 I.
A. Factual Background
 Clean Harbors is an environmental services company based
in Braintree, Massachusetts. Its services include treating,
storing, hauling, and disposing of hazardous waste. Dutkiewicz
began working for Clean Harbors as a truck driver in August of
1993, out of the company's service center in New Britain,
Connecticut. Dutkiewicz' primary duty was to haul hazardous waste
between the customers' facilities and Clean Harbors' treatment
plant in Bristol, Connecticut. This job required Dutkiewicz to
inspect the waste containers for compliance with the law, to
inventory, and to load the waste containers onto his truck before
hauling them. All of these activities are governed by DOT and
Environmental Protection Agency ("EPA") regulations. If customers
do not properly prepare their drums of waste for shipment, the
driver must spend time at the customers' facilities bringing the
drums into compliance with the regulations.
 When Dutkiewicz began working for Clean Harbors he
received training on compliance with DOT regulations. Dutkiewicz
also studied the regulations on his own, and had prior work
experience in hauling hazardous materials. No one seriously
questioned Dutkiewicz' familiarity with the various regulations
that governed his work activities.
 Thor Cheyne was the general manager of the New Britain
service center during Dutkiewicz' initial tenure with Clean
Harbors. Dutkiewicz reported to Cheyne, as well as to Dave Mills,
who was Dutkiewicz' job coordinator. Peter Ferrio and Peter Doyle
were customer account managers who dealt with the customers to whom
Dutkiewicz was assigned. No single individual at the New Britain
facility was specifically assigned the task of ensuring compliance
with the environmental and safety regulations; instead, each
driver was individually responsible for ensuring regulatory
compliance on his own jobs.
 Soon after Dutkiewicz started working for Clean Harbors,
the company began charging customers for "demurrage," or extra time
the drivers spent at the customers' facilities filling out
paperwork and bringing the shipments into compliance for hauling. 
Previously the customers were charged by the job, rather than by
the amount of time the driver took to complete the job. After this
new charge was imposed, several large-account customers began
complaining about Dutkiewicz. According to the company, the
customers complained that he was taking too much time at their
facilities, second-guessing their shipment preparation, and costing
them too much money. In turn, several of the New Britain personnel
-- Cheyne, Ferrio, and Doyle in particular -- pressured Dutkiewicz
to stop "wasting time" on site.
 Dutkiewicz responded to this pressure saying the
customers who complained were the ones who had the most problems
with their shipments, and he took the extra time to bring their
drums of hazardous waste into compliance before loading them on to
his truck. Dutkiewicz stressed that it was his obligation to
ensure regulatory compliance, that he personally could be put at
risk, and he would not violate the law and endanger himself and
others.
 As the pressure to perform fast pick-ups continued,
Dutkiewicz became increasingly frustrated with what he believed
were demands to violate the law, and he decided to document the
situation. In early January 1994, Dutkiewicz designed his own drum
inspection form. The form listed all of the regulatory
requirements and provided space for the driver to document whether
the customer had complied with the requirements or whether the
driver had to spend time fixing the shipments. Dutkiewicz gave
copies to the customer service department and to Cheyne, and
subsequently used the forms to document each of his pick-ups. 
Dutkiewicz hoped the forms would clarify why he was spending time
at the customers' facilities and prove that he was not "wasting
time."
 In early February 1994, Dutkiewicz received a six-month
performance appraisal from Cheyne. Dutkiewicz' overall performance
was said to "meet expectations" and he was given a raise. In one
of the "comments" sections, Cheyne wrote that "Tom's thoroughness
has raised several questions with customers as to his productivity. 
Tom should continue his quality in that it is quality that
customers are buying from [Clean Harbors]."
 In early March, in response to continued pressure from
Cheyne and Ferrio to spend less time preparing drums, Dutkiewicz
wrote a letter to Clean Harbors president Alan McKim. The letter
stated, inter alia:
 I would like to address when a bad drum
 is accepted. Clean Harbors and everybody else
 connected with the drum owns all the problems
 that go with it. Thor [Cheyne] didn't know if
 it was a Tom [Dutkiewicz] problem or a
 customer problem . . . . So I designed a form
 for myself to show all concerned what the
 drums were like when I arrived on site, were
 the problems solved, and were any [drums]
 refused [by the driver].
 Now when a customer ask [sic] why they
 were charged for extra time, Thor has
 documentation on what I did to correct the
 problem that a customer should have done to
 make them DOT shippable. I've included a copy
 of this form for your review. 
 Sometime in mid-March, Cheyne and Ferrio scolded
Dutkiewicz for taking too much time at the facility of one company,
a major Clean Harbors account. Dutkiewicz gave his usual response,
and invited Cheyne to accompany him on his next run to the company
to see for himself that the drums were not in compliance. Cheyne
turned down the offer.
 On April 18, 1994, Cheyne wrote Dutkiewicz this note:
 Tom, I would like you to get in and out of
 [the customer's premises] w/o demurrage or
 extra time regardless of condition of drums. 
 Thor
 T.T. [Talk To] me if you have any questions.
The note was attached to a memorandum from John Shomsky -- a
customer service representative -- which stated that the customer
had complained about Dutkiewicz wasting time on site. Dutkiewicz
understood the note to be a direction from his supervisor to accept
and haul drums even if the drums did not comply with DOT
regulations. 
 The Cheyne note became the smoking gun in this dispute. 
Clean Harbors argues that this note was in fact a direction to
leave behind any non-compliant drums, not a direction to haul them. 
But the ALJ and the ARB rejected that interpretation of the note
for several reasons. Cheyne himself did not testify, and a Clean
Harbors employee testified that the note could plausibly be read as
Dutkiewicz read it. The evidence adequately supports the agency's
interpretation of the note. 
 Dutkiewicz responded to the note by writing a letter to
Cheyne and Shomsky, dated April 19, 1994, stating:
 First I would like to address the last
 pickup from [the customer]. From the time I
 arrived until Irene came down 20 minutes
 passed. She had visible waste on three drums,
 three drums didn't have any poison or
 corrosive label on them, and two drums had lid
 rings up side [sic] down. She has problems
 making her drums shippable.
 The DOT is not very forgiving if I get
 stopped because of [sic] one of my drums is
 leaking. No driver in this company will
 accept a drum that is not DOT shippable just
 to make the customer happy. Not only will I
 get in trouble, its [sic] against the law.
 . . . .
 The problems relating to customers
 complaining didn't start until the customer
 was charged for time spent on site to correct
 drums. And the ones that complained were the
 ones that have trouble making their drums
 shippable. 
 Believe me when I say it, I have a lot
 of ground to cover in a course of a day. I
 don't have time to waste on purpose at a
 customers [sic] just to make more hours. 
 There is no such saying, there is a faster way
 of making a drums [sic] shippable. And as
 long as people like Irene . . . have improper
 drums, I will have to spend time making them
 right. Irene is not in transportation, what
 she thinks is shippable may very well be not
 shippable according to the DOT. That's my
 job, is to determine what is or what isn't
 shippable.
 . . . . 
 In conclusion, . . . I refused [sic] to
 be blamed for this or other shippers [who are
 unable] to properly label, mark, and secure
 drums. Yes, the customer is always right, up
 to a point. No one should be abused by
 customers or be put at risk because of a
 customer. There are a lot of clients out
 there who really don't care.
 . . . If you think I'm wrong in my
 whole assessment, please feel free to call
 Tony Cellucci or Kent Bongarzone [compliance
 department supervisors] and we can discuss
 this matter in further detail.
The record reveals no effort on the part of Cheyne or Ferrio to
contact the compliance department, or to determine whether or not
Dutkiewicz was correct that the customers were not properly
preparing their hazardous materials for shipment.
 Dutkiewicz also showed the Cheyne note to Dave Cyr, the
Clean Harbors operations manager at the Bristol, Connecticut
facility, and to Brian Peterson, the general manager of the
Bristol facility. Dutkiewicz testified that he "told Dave Cyr [he]
was concerned about protecting [him]self in the future," and that
he "also wanted to alert them that Thor Cheyne was instructing
Clean Harbors' personnel to engage in practices contrary to EPA and
DOT regulations."
 On September 1, 1994, Cheyne gave Dutkiewicz his second
performance review. He rated Dutkiewicz' overall performance as
"meets expectations," and gave Dutkiewicz a raise. 
 Two weeks later, Ferrio sent a memorandum to Cheyne
stating that Ferrio had received more complaints about Dutkiewicz. 
Ferrio suggested that Cheyne either replace Dutkiewicz or find
another job for him in which there was no customer contact. Later
that same day Ferrio wrote another note to Cheyne indicating that
if Cheyne failed to take proper action Ferrio would "go over
[Cheyne's] head." Three days later, September 19, 1994, Cheyne did
as Ferrio asked and fired Dutkiewicz. He told Dutkiewicz that
customers were upset because he was wasting too much time fixing
drums.
 Dutkiewicz immediately phoned and wrote Steven Pozner,
the company vice president for compliance, health and safety. 
Dutkiewicz complained that his discharge resulted from Cheyne's
lack of understanding of the DOT regulations, Cheyne's immediate
impulse to side with the customers and customer service managers,
and Dutkiewicz' refusal to cut corners. Dutkiewicz requested that
the corporate office investigate his discharge and reinstate him.
 The company initially upheld the termination. When
Dutkiewicz' wife phoned Tony Celluci, director of transportation
compliance, and threatened to report the termination to the federal
government and the media, the company offered Dutkiewicz three
weeks of paid leave and agreed to investigate the termination
further. Clean Harbors hired a consultant, who ultimately
suggested that Dutkiewicz could be reinstated, albeit with strict
supervision and under a rigid chain of command. 
 In late October, 1994, Clean Harbors reinstated
Dutkiewicz as a driver based at the Bristol facility. His new job
was to haul waste between the company's own facilities, rather than
from customers' facilities. The new job offer was conditioned on
Dutkiewicz' acceptance of a strict chain of command: Dutkiewicz
was to direct any questions or comments only to John Caron, the
Bristol Transportation Coordinator, or to Brian Monahan, the
Bristol Director of Logistics. When Dutkiewicz started work, he
met with Caron and Monahan who informed Dutkiewicz that he was "on
a short leash."
 Dutkiewicz testified that over the next few months he
noticed a number of DOT regulations violations, and reported them
to his supervisors and corporate compliance personnel. Monahan
terminated Dutkiewicz on January 16, 1995, stating simply that
things were not working out and Dutkiewicz and Clean Harbors were
a bad match.
B. Procedural Background
 After he was fired the second time, Dutkiewicz filed a
timely complaint with the Department of Labor ("DOL"), claiming
Clean Harbors terminated him (twice) in violation of the employee
protection provision of the STAA. That provision reads:
 (a) Prohibitions. (1) A person may not
 discharge an employee regarding pay, terms, or
 privileges of employment, because --
 (A) the employee, or another person at
 the employee's request, has filed a complaint
 or begun a proceeding related to a violation
 of a commercial motor vehicle safety
 regulation, standard, or order, or has
 testified or will testify in such a
 proceeding; or
 (B) the employee refuses to operate a
 vehicle because --
 (i) the operation violates a
 regulation, standard, or order of the United
 States related to commercial motor vehicle
 safety or health; or
 (ii) the employee has a reasonable
 apprehension of serious injury to the employee
 or the public because of the vehicle's unsafe
 condition.

49 U.S.C. 31105(a). After investigation, the OSHA Regional
Administrator (acting pursuant to DOL regulations) found that
Dutkiewicz' claim was unsupported, and dismissed the complaint. 
Dutkiewicz objected to the findings and had a hearing before an
ALJ.
 The ALJ, who credited Dutkiewicz' testimony, found that
Dutkiewicz had engaged in protected activity under both 31105
(a)(1)(A) and (B), and that both of his employment terminations
were related to these protected activities. As for (a)(1)(A),
the ALJ found that, before the first of his employment
terminations, Dutkiewicz continuously complained to Cheyne that he
was pressured by the customer service personnel and by Cheyne to
violate DOT regulations. The ALJ also found that, "with respect to
refusal to operate a vehicle [ (a)(1)(B)], complainant has
presented evidence by his own testimony, supported by his
contemporaneously prepared drum inspection forms, that he
continuously refused to drive Clean Harbors vehicles containing
hazardous materials that he believed violated DOT regulations." 
The ALJ agreed that customer complaints could be a valid reason for
discharging an employee, but found that Clean Harbors fired
Dutkiewicz because he refused to compromise his fastidious
compliance with the regulations, thereby angering customers and
jeopardizing accounts. The ALJ also found that the second firing
was inextricably linked to the first unlawful dismissal. The ALJ
concluded that Clean Harbors had violated the STAA, and ordered
damages and reinstatement for Dutkiewicz. 
 The ARB found that the ALJ's "findings of fact . . . are
supported by substantial evidence on the record as a whole and
therefore are conclusive." See 29 C.F.R. 1978.109(c)(3). It
also adopted the ALJ's assessments of witness credibility. The ARB
then affirmed the ALJ's decision to order damages and
reinstatement, but it did so based solely on the fact that
Dutkiewicz' termination was related to his protected activity of
"fil[ing] a complaint."
 II.
 We review the ARB's final decision in accordance with the
dictates of the Administrative Procedure Act, 5 U.S.C. 701 et
seq. The ARB's decision must be affirmed unless its legal
conclusions are arbitrary, capricious, or otherwise not in
accordance with law, or its factual conclusions are unsupported by
substantial evidence. See 5 U.S.C. 706(2); Castle Coal & Oil Co.v. Reich, 55 F.3d 41, 44 (2d Cir. 1995).
A. Statutory Interpretation
 Dutkiewicz filed no complaints with a court or government
agency before his first employment termination. Thus, the ARB's
determination that Dutkiewicz engaged in protected activity depends
entirely upon a reading of 31105(a)(1)(A) to cover complaints
which are purely internal to the employer. This interpretation of
"filed a complaint or begun a proceeding" raises an issue of law.
 Citing its own precedent, the ARB found that "[a]n
employee's internal complaint to superiors conveying his reasonable
belief that the company was engaging in a violation of a motor
vehicle safety regulation is a protected activity under [
31105(a)(1)(A)]." Dutkiewicz v. Clean Harbors Envtl. Servs., Case
No. 97-STA-090, Sec. Dec. and Ord., Aug. 8, 1997, slip op. at 3-4
("ARB Dec.") (citing Stiles v. J.B. Hunt Transp., Inc., Case No.
92-STA-34, Sec. Dec. and Ord., Sept 24, 1993, slip op. at 3-4).
 Clean Harbors argues that the ARB's interpretation of the
STAA is in contravention of that statute's plain meaning, and that
"this ['filed a complaint or begun a proceeding'] language clearly
connotes the initiation of a formal administrative or court
proceeding and not merely internal complaints." Clean Harbors
contrasts this STAA language with the anti-retaliation provisions
of other statutes, most notably, Title VII, which provides:
 It shall be an unlawful employment practice
 for an employer to discriminate against any of
 his employees . . . because he has opposed any
 practice made an unlawful employment practice
 by this subchapter, or because he has made a
 charge, testified, assisted, or participated
 in any manner in an investigation, proceeding,
 or hearing under this subchapter.

42 U.S.C. 2000e-3. According to Clean Harbors, because Congress
could have used this language in the STAA -- language which clearly
protects an employee who makes internal complaints -- it must have
intended the narrower language it ultimately did use not to protect
an employee who makes purely internal complaints.
 We reject the company's interpretation that the STAA
anti-retaliation protection is available only to employees who file
complaints with a government agency or a court. We do so for four
reasons. First, the language is susceptible to more than one
reading. Second, the Congress hewed to this language when it
reenacted the STAA in 1994, in the face of long-standing
administrative interpretation of the STAA and similar language in
other statutes to encompass internal complaints made to an
employer. Third, in the absence of unambiguous statutory language,
this strikes us as the sort of interstitial law making which
Congress left to the agency, under Chevron v. Natural Resources
Defense Council, 467 U.S. 837, 843-44 (1984). Fourth, the policy
choice made by the agency is eminently reasonable. It is
reasonable in terms of leveraging the government's limited
enforcement resources.
 The STAA was originally enacted in 1983. The employee
protection provision, like other whistleblower statutes, was
intended to create a climate in which employees would feel free to
voice their health and safety concerns without fear of employer
retaliation. See Brock v. Roadway Express, Inc., 481 U.S. 252, 257
(1987) ("Section [31105] was enacted in 1983 to encourage employee
reporting of noncompliance with safety regulations governing
commercial motor vehicles."). 
 The STAA was recodified and reenacted in 1994, expressly
without substantive change. See Revision of Title 49,
Transportation, United States Code, Pub. L. 103-272, 1, 108 Stat.
745, 990-91 (1994). In the years between 1983 and 1994, the
Secretary of Labor and two courts of appeals interpreted the
employee protection language to encompass purely internal
complaints. See Yellow Freight Sys., Inc. v. Reich, 8 F.3d 980,
986 (4th Cir. 1993) (oral complaints to supervisor "are protected
activity under the STAA"); Moon v. Transport Drivers, Inc, 836 F.2d
226, 227-29 (6th Cir. 1987) (finding that driver had engaged in
protected activity under the STAA where driver had made only oral
complaints to supervisors); Stiles, Case No. 92-STA-34, slip op. at
3-4 (citing cases); see also Yellow Freight Sys., Inc. v. Martin,
983 F.2d 1195, 1198 (2d Cir. 1993) (implying but not specifically
stating that employee's internal safety complaints were covered by
 31105(a)). 
 In addition, a large body of judicial case law developed,
consistently interpreting language either identical or very similar
to the language in 31105(a)(1)(A) to encompass internal employee
complaints. See, e.g., Passaic Valley Sewerage Comm'rs v. United
States Dep't of Labor, 992 F.2d 474, 478 (3d Cir. 1993)
(interpreting 507 of the Clean Water Act, which prohibits
retaliation against an employee because the employee has "filed
[or] instituted . . . any proceeding under this chapter," to
include the filing of intracorporate complaints); EEOC v. Romeo
Community Sch. Dist, 976 F.2d 985, 989-90 (6th Cir. 1992)
(interpreting Fair Labor Standards Act ("FLSA"), 29 U.S.C. 
215(a)(3), which prohibits retaliation against an employee "because
such employee has filed any complaint or instituted . . . any
proceeding under or related to [the FLSA]," to protect employees
who make unofficial complaints to their supervisors); Rayner v.
Smirl, 873 F.2d 60, 63-64 (4th Cir. 1989) (interpreting Federal
Railway Safety Act ("FRSA"), 45 U.S.C. 441, which prohibits
retaliation because an employee has "filed any complaint or
instituted or caused to be instituted any proceeding" under the
FRSA or related safety laws, to protect employees who make purely
internal complaints); EEOC v. White and Son Enters., 881 F.2d 1006,
1011 (11th Cir. 1989) (interpreting FLSA language, 29 U.S.C. 
215(a)(3), to include "unofficial complaints expressed by the women
to their employer"); Love v. Re/Max of America, Inc., 738 F.2d 383,
387 (10th Cir. 1984) (same). But see Lambert v. Genesee Hosp., 10
F.3d 46, 55 (2d Cir. 1993) (interpreting FLSA not to encompass
complaints made to a supervisor). 
 Congress was surely aware of these administrative and
judicial interpretations when it reenacted the STAA without
substantive change. See Lorillard v. Pons, 434 U.S. 575, 580
(1978) ("Congress is presumed to be aware of an administrative or
judicial interpretation of a statute and to adopt that
interpretation when it reenacts a statute without change."). If
Congress wanted to restrict the protected activity in 
31105(a)(1)(A) to filing complaints with the courts or agencies, it
would have done so when it recodified the law.
 We also find persuasive the Secretary of Labor's argument
that interpreting "filed a complaint" to encompass only filings
with a court or government agency would create a redundancy in the
statute. The STAA protects employees who have "filed a complaint"
or "begun a proceeding." 49 U.S.C. 31105(a)(1)(A). A court or
agency filing itself "beg[ins] a proceeding," and the "file a
complaint" language would thus be superfluous on Clean Harbors'
reading of the statute. See Bailey v. United States, 516 U.S. 137,
146 (1995) ("We assume that Congress used two terms because it
intended each term to have a particular, nonsuperfluous meaning."). 
 Moreover, the ARB's interpretation is reasonable. First,
it is supported by the obvious policy of encouraging corporate
compliance with such laws by casting a broad net in the anti-
retaliation provisions. As the Supreme Court has noted in
interpreting an analogous whistleblower statute, "it needs no
argument to show that fear of economic retaliation might often
operate to induce aggrieved employees to accept substandard
conditions." Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S.
288, 292 (1960) (interpreting employee protection provision in
FLSA). A construction of the STAA that covers only complaints
filed with courts or government agencies would narrow the
mechanisms to achieve these policy goals, leaving unprotected
employees who in good faith assert safety concerns to their
employers, or who indicate an unwillingness to engage in such
violations. See Passaic Valley, 992 F.2d at 478 ("Section 507(a)'s
protection would be largely hollow if it were restricted to the
point of filing a formal complaint with the appropriate external
law enforcement agency."). 
 Interpreting 31105(a)(1)(A) to protect only employees
who file external complaints would result in an anomalous and
inefficient system. The effect of the system urged by Clean
Harbors would be to force employees with safety concerns to go
straight to the government. A company's opportunity to remedy its
own problems voluntarily and quietly would be lost. Cf. id. at
478-79. Thus, the DOL's interpretation in many ways helps
companies. There is the contrary argument that companies will
benefit economically by reducing the number of employee complaints
by making employees go to greater efforts to file a complaint with
the government. That some employees (unhappy with company
practices) may choose silence over going directly to the government
may indeed permit a company to skate by the requirements of the law
for a period, and (perhaps) temporarily benefit economically. But
the penalties for noncompliance are high, and unhappy employees are
likely to help the government make its case once the government
does become involved. It is reasonable to conclude that the ARB's
position is fairer and less wasteful of resources for both the
corporate community and the government than the position offered by
Clean Harbors.
 Clean Harbors does make one very telling argument: that
its interpretation of the statute provides clean and simple
guidance on what a "complaint" is and the agency's interpretation
unhelpfully leaves employers in the dark. What sort of internal
complaint is "filing a complaint" for purposes of the Act? We
think the problem, while real, is not sufficient to invalidate the
agency's interpretation, and may be dealt with as a matter of
factual analysis.
 The ARB's construction of the STAA is plainly a
reasonable and permissible one.
B. Substantial Evidence
 Clean Harbors protests that there is not substantial
evidence that what Dutkiewicz did amounted to filing a complaint or
that this activity is why Clean Harbors terminated his employment. 
Substantial evidence is "such relevant evidence as a reasonable
mind might accept as adequate to support a conclusion." 
Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation and
quotation marks omitted). 
 A prima facie case of unlawful termination under the STAA
requires a showing that the employee engaged in protected activity,
that the employee was subjected to adverse employment action, and
that there was a causal connection between the protected activity
and the adverse action. See Moon, 836 F.2d at 229. Clean Harbors
took adverse employment action against Dutkiewicz, but contests
that Dutkiewicz engaged in any protected activity, and that there
was a causal link between any protected activity and the adverse
employment action.
 The familiar burden-shifting analysis employed under
Title VII has also been employed under the STAA. Where a
complainant has made out a prima facie case of retaliatory
discharge, the employer may rebut that showing with evidence of a
legitimate, non-retaliatory reason for the discharge. The burden
then shifts back to the complainant to prove that the proffered
reason is pretext for unlawful retaliation. See id. (adapting
framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S.
792 (1973), to a STAA claim). Where evidence of a dual motive
exists, i.e., where there are legitimate reasons for a discharge in
addition to the unlawful reasons, the employer bears the burden of
establishing by a preponderance of the evidence that it would have
taken the adverse employment action in the absence of the
employee's protected activity. Cf. Price Waterhouse v. Hopkins,
490 U.S. 228, 242 (1989). Both parties have accepted this as the
standard and we do not reexamine it.
1. "Filing" a Complaint
 The facts of record support the ARB's determination that
the activity in which Dutkiewicz engaged met the requirements for
"filing a complaint." There is no problem of lack of fair notice
on this record and we affirm that there was substantial evidence
that Dutkiewicz "filed a complaint."
 We recognize Clean Harbors' legitimate due process
concerns that the internal communications to the employer must be
sufficient to give notice that a complaint is being filed and thus
that the activity is protected. In the absence of such notice, the
beneficial purposes of the act cannot be accomplished. Clearly
there is a point at which an employee's concerns and comments are
too generalized and informal to constitute "complaints" that are
"filed" with an employer within the meaning of the STAA. The risk
of inadequate notice to an employer that the employee has engaged
in protected activity is greater when the alleged protected
complaints are purely oral. Here, however, we have no trouble
concluding that Dutkiewicz' oral and written complaints were
sufficiently definite to put Clean Harbors on notice that he was
engaging in protected activity. The record makes it clear that
Dutkiewicz' superiors were well-aware of his fastidious compliance
with safety regulations and his oral and written refusals to
accommodate this practice for the sake of customer satisfaction. 
 The agency accepted Dutkiewicz' testimony that when
Cheyne and Ferrio repeatedly urged him to perform quicker pick-ups,
he complained to them that such action would result in regulatory
violations, and that he was obligated by law to make sure the
customers' drums were DOT-shippable before he hauled them. He
continued to say this to Cheyne throughout the remainder of his
initial tenure at Clean Harbors. Because Cheyne did not testify,
Dutkiewicz' testimony that he repeatedly complained to Cheyne was
unrefuted. The ALJ credited Dutkiewicz' testimony, and found that
Dutkiewicz did have a genuine, reasonable belief on many occasions
that drums tendered to him for shipment did not comply with DOT
regulations. The ARB accepted the ALJ's credibility
determinations, and agreed with this finding. Dutkiewicz'
testimony is further supported by the drum inspection forms which
he contemporaneously created and filled out to protect himself from
accusations of wasting time.
 Aside from the oral complaints and the drum inspection
forms, Dutkiewicz wrote two letters to his superiors complaining
that he felt pressured to engage in regulatory violations. The
first such letter was written on March 5, 1994, to the president of
Clean Harbors, Alan McKim. In the letter Dutkiewicz asserts that
when a "bad drum" is accepted, "Clean Harbors and everybody else
connected with the drum owns all the problems that go with it. 
Thor didn't know if it was a [Dutkiewicz] problem or a customer
problem. . . . So I designed a form for myself to show all
concered what the drums were like when I arrived on site, were the
problems solved, and were any [drums] refused."
 The second letter was written the day after Dutkiewicz
received Cheyne's demand that Dutkiewicz "get in and out of [the
customer's premises] . . . regardless of the condition of the
drums." Dutkiewicz responded with a letter to Cheyne and Ferrio,
in which he specifically complained that on his last trip the drums
were not prepared for shipment: there was "visible waste on three
drums, three drums didn't have any poison control labels on them,
and two drums had lid rings upside down." The letter reminded
Cheyne and Ferrio that:
 The DOT is not very forgiving if I get stopped
 because of one of my drums is leaking. . . .
 Not only will I get in trouble, its [sic]
 against the law. . . . I have a lot of ground
 to cover in a course of a day. I don't have
 time to waste on purpose at a customers . . .
 . And as long as customers have improper
 drums, I will have to spend time making them
 right. 
 The facts here show Clean Harbors was put on notice and
Dutkiewicz "filed" a complaint.
2. Causation
 Clean Harbors' second major factual argument is that even
if Dutkiewicz did engage in protected activity and "filed" a
complaint, he was fired for the legitimate reason that he was
angering customers. The record reveals substantial evidence for
the ARB's finding that Dutkiewicz was terminated at least in part
because of his protected activity, and that Clean Harbors failed to
prove that it would have terminated Dutkiewicz had he not engaged
in protected activity. 
 It was reasonable to conclude the following from the
evidence. Cheyne and Ferrio pressured Dutkiewicz to speed up his
customer pick-ups. Dutkiewicz refused orally and in writing to
submit to this pressure -- pressure that he reasonably believed
amounted to a demand to violate the law. As customers continued to
complain about Dutkiewicz' on-site delay, the customer service
staff became increasingly frustrated with Dutkiewicz' refusal to
expedite his pick-ups. Ferrio pressured Cheyne to replace or
transfer Dutkiewicz. Despite the fact that Cheyne had twice given
Dutkiewicz a favorable performance appraisal, Cheyne complied with
Ferrio's request and fired Dutkiewicz. Thus, Clean Harbors
initially fired Dutkiewicz at least in part because he objected on
safety grounds to the demands that he perform faster pick-ups. 
 Clean Harbors failed to prove that it would have fired
Dutkiewicz had he not complained about regulatory violations and
refused to expedite his on-site drum preparations. At the hearing,
Clean Harbors failed to call Cheyne as a witness and failed to call
any of the complaining customers as witnesses. Instead, Clean
Harbors chose to rely on the testimony of the customer service
manager about the customer complaints. The ARB found that, in the
absence of any customer testimony, there was no basis to conclude
that customer complaints unrelated to Dutkiewicz' enforcement of
the STAA would have been sufficient to otherwise justify the
termination of Dutkiewicz' employment. A company may reasonably
choose not to impose on its customers to appear as witnesses at
trial about complaints they have made, but it does so at its own
risk where the customer complaints may give the appearance of being
based on the employee's refusal to violate the law. 
 It may be, as Clean Harbors so vociferously argues now,
that Dutkiewicz was rude to customers and that rudeness, and not
Dutkiewicz' obduracy about non-conforming drums, was what motivated
the complaints. But the agency was not required to believe the
accounts of the customer complaints from the customer service
manager. This is particularly so where neither Cheyne nor Ferrio
ever accompanied Dutkiewicz on a customer pick-up in order to
confirm or dispel Dutkiewicz' allegations that the customers were
not properly preparing their shipments. They were apparently less
concerned with the accuracy of Dutkiewicz' allegations than with
the satisfaction of their customers. 
 Thus, there is sufficient support for the conclusion that
the initial termination of Dutkiewicz' employment was in violation
of the law.
 Throughout, the company's brief argues that it was not
logical for the company to do what Dutkiewicz claims it did. This
is too simple a view and, in any event, a misapprehension of the
standard of review. People do things which may strike others as
illogical; notions of what is in an actor's self interest may look
different to an outside observer than to the actor. A company may
have many actors and their individual perceived interests, e.g.
satisfaction of a complaining customer, may differ from what is
ultimately in the company's interest, e.g. avoidance of a lawsuit
for retaliatory discharge. This has been referred to as the theory
of "agency costs," where seemingly irrational behavior on the part
of a corporation may be explained by the divergence of objectives
between a corporation and its employees. See Cambridge Plating
Co., Inc. v. Napco, Inc., 85 F.3d 752, 756 (1st Cir. 1996);
AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc., 896 F.2d 1035,
1043 (7th Cir. 1990). Further, as Justice Holmes famously said,
the life of the law has not been logic, but experience. The
standard of review is not whether the findings by the agency
comport with a company acting logically, but whether there is
substantial evidence to support the agency's findings. 
 But Dutkiewicz was reinstated, so we shift our focus to
the second termination. This is a closer issue. Clean Harbors'
articulated reasons for terminating Dutkiewicz the second time were
that he had twice bucked the chain of command, and once had made a
complaint about Clean Harbors to the Massachusetts Department of
Environmental Protection. Specifically, Brian Monahan testified
that: (1) Dutkiewicz made an unauthorized call to Brian House, the
Vice President of Field Services, and left a lengthy voice mail
criticizing a new waste-tracking procedure for use by the company
drivers, thereby violating the agreed-upon chain of command; (2)
Dutkiewicz called Joseph Lentini, computer installation manager, to
request a cellular phone for his truck, again violating the chain
of command; and (3) Dutkiewicz contacted the Massachusetts
Department of Environmental Protection ("DEP") in bad faith to
complain that Clean Harbors was not using proper vehicle
identification decals for trucks going to Massachusetts.
 The ARB found that the third reason was itself violative
of the STAA: 
 Here, even though Dutkiewicz received an
 acceptable response from Clean Harbors
 employees -- that he should drive a different
 truck rather than the one that lacked a
 vehicle identification card -- he still had
 the right to speak with DEP concerning a
 safety issue within that agency's purview. We
 find therefore that one of the articulated
 reasons for the second discharge directly
 violated the STAA. 

ARB Dec. at 7. As for Dutkiewicz' failure to adhere to the agreed-
upon chain of command, the ARB "agree[d] with the ALJ that the
reasons for the first discharge tainted the potentially
'legitimate' reasons articulated for the second discharge." Id. 
The ARB then concluded that "Clean Harbors did not show that it
would have discharged Dutkiewicz the second time if he had never
engaged in any protected activities during his employment with the
company." Id.
 Substantial evidence supports the ARB's findings. Under
the STAA, Clean Harbors may not fire Dutkiewicz for raising a
reasonable safety-related concern with a government agency, here
the Massachusetts DEP. The evidence supports the ARB's implicit
determination that Dutkiewicz' concern regarding proper vehicle
identification was reasonable. And it is also clear from the
record that upon his reinstatement, Dutkiewicz, unlike other
employees, was required to adhere to a rigid chain of command
precisely because of Clean Harbors' previous frustration with
Dutkiewicz. That frustration related to Dutkiewicz' protected
complaints and strict adherence to safety regulations. Clean
Harbors argues that Monahan, Dutkiewicz' supervisor who fired
Dutkiewicz the second time, was a new Clean Harbors employee and
had no knowledge of the prior relationship between Clean Harbors
and Dutkiewicz. Clean Harbors asserts that Monahan had "no axe to
grind" as far as Dutkiewicz was concerned, and wanted Dutkiewicz to
succeed at Clean Harbors. But Monahan himself testified he was
aware of some prior history and had read the consultant's report. 
That report stated that Dutkiewicz felt his prior termination
resulted from his raising safety concerns.
 We also find it significant, as did the agency, that
Dutkiewicz received no oral or written warnings about any of the
three incidents which Clean Harbors says justified his discharge. 
That is so although Clean Harbors had agreed to document
disciplinary violations. The excuse that Clean Harbors gave for
its failure to warn Dutkiewicz is that there was no time to give
warnings. That excuse is weak, given that the "violations" of the
chain of command hardly triggered emergencies. We uphold the ARB's
finding that the second termination violated the STAA as based on
substantial evidence.
 The facts in this case do not compel a finding that
Dutkiewicz' firing was caused by rudeness and poor manners with
customers, as Clean Harbors asserts is true. Nor do the facts
compel a finding that Clean Harbors fired an employee for
complaining about safety issues. This is a close case and Clean
Harbors failed to convince the agency that its motives were
unrelated to Dutkiewicz' complaints about safety issues. There is
enough evidence to support the agency's determination and so it is
affirmed.
 The decision of the ARB is affirmed. Costs awarded to
both the Secretary of Labor and Dutkiewicz.