# STATE OF MICHIGAN

# COURT OF APPEALS

MARY MA,

        Plaintiff-Appellant,

v

LAWRENCE J. WEBER, MICHAEL H.
CARLSON, RANDY F. EBRIGHT, GREGORY J.
HILL, MICKEY L. BELLVILLE, and KEITH A.
STEINMETZ,

        Defendants-Appellees.

UNPUBLISHED
June 15, 2017

Nos. 330380 and 332462
Berrien Circuit Court
LC No. 14-000175-CD

Before: GADOLA, P.J., TALBOT, C.J., and GLEICHER, J.

PER CURIAM.

Plaintiff, Mary Ma, was employed by American Electric Power, Inc. (AEP) for eleven years prior to her termination in 2011. On June 17, 2011, AEP discharged Ma. After AEP ended the employment relationship, Ma filed suit in federal district court. Specific factual findings were made after a bench trial[1] that, when applied in this matter, require that summary disposition be granted in defendants' favor. We conclude that these factual findings must be given preclusive effect in this case. Thus, in Docket No. 330380, we affirm the trial court's decision to grant summary disposition in defendants' favor.

In Docket No. 332462, defendants appeal as of right from a subsequent order of the trial court denying their motions for attorney fees and for the taxation of certain costs. Finding no errors in the trial court's decision, we likewise affirm this order.

## I. FACTS

Ma was hired by AEP in 2000 as a mechanical engineer. She worked at the Donald E. Cook Nuclear Plant (the Plant), which is operated by AEP. Eventually, she became a supervisor, first of AEP's operations group, and in 2009, of AEP's nuclear safety analysis group. At the time Ma's employment with AEP ended, her direct supervisor was defendant Mickey Bellville,

---

[1] *Ma v American Electric Power, Inc*, 123 F Supp 3d 955 (2015).

the Plant's Nuclear Engineering Manager.  Bellville reported to defendant Randy Ebright, the director of the Plant's Engineering organization.  Ebright reported to defendant Mike Carlson, the Plant's Vice President.  Carlson reported to the highest ranking officer of the Plant, Chief Nuclear Officer Larry Weber, another defendant to this suit.  Defendant Keith Steinmetz was the Plant's Nuclear Fuels supervisor.  Defendant Gregory Hill was another engineer employed at the Plant.

During her tenure with AEP, Ma received many satisfactory performance reviews.  In 2009, she received a "Key Contributor Award," a highly selective award that only a few employees receive each year.  However, as the federal district court explained:

> On the other hand, Ma also had a series of interpersonal conflicts with other employees at AEP, particularly those who worked in groups other than her own.  These interpersonal conflicts went beyond just an uncomfortable relationship between colleagues, and seriously compromised the ability of some individuals to work together.  For instance, Ma and Supervisor Keith Steinmetz had interpersonal conflicts during Ma's time at AEP. . . . Ma also did not get along with Engineer Greg Hill; their relationship was marked by several altercations indicating that the two had no personal affection for each other.  Again, this animosity seriously undermined the ability of these individuals to work together . . . .

> This created untenable circumstances that adversely affected the groups' ability to collaborate on error resolution, and in turn, the promise of safe working conditions at AEP.  The interpersonal conflicts served to cultivate the impression among many of Ma's colleagues that she was not a team player.  For instance, Chief Nuclear Counsel and Regulatory Affairs Manager Jim Petro testified that when it came to Ma, "everything in her view was an us and a them." . . . And [Human Resources] specialist Tiffany Rydwelski testified that she was concerned that "people wouldn't go to [Ma] for concerns because [Ma] would deflect or take criticism of someone challenging her work." . . .

> . . . In fact, the Court observes that interpersonal issues concerning Ma dated all the way back to 2003, and that the frequency of Ma's incidents concerning interpersonal conflicts increased in the time leading up to her termination.  The interpersonal conflicts occurred often enough, over a sustained period of time and with a similar enough pattern for the Court to conclude that Ma is the common denominator of the troubled relationship, and the root source of the inability to forge constructive working relationships amidst interpersonal conflict.[2]

The events that ultimately led to Ma's discharge were described by the federal district court as follows:

---

[2] *Id.* at 958-959.

In March 2010, Engineer Hill and Supervisor Steinmetz had raised a safety concern relating to Ma. They believed that Ma and her group may have engaged in misconduct. In particular, they believed that Ma had intentionally withheld information regarding an evaluation for a fuel reload project. Supervisor Steinmetz reported his safety concern to one of AEP's managers. The manager did not take action. Director Ebright also investigated the matter, and determined that there was no evidence to support the contention that Ma had improperly withheld information.

In May 2010, Ma raised a safety concern by filing a Condition Report. In the Condition Report, Ma notified AEP's high-level management that some of her fellow engineers may have intentionally withheld information from the Nuclear Regulatory Commission. Specifically, Ma indicated that these engineers were allegedly aware of certain errors concerning a nuclear safety analysis but failed to notify the Nuclear Regulatory Commission of those errors, which, if true, would constitute a violation of Nuclear Regulatory Commission regulations. In the report, Ma specifically listed the names of those who she believed were in the wrong, including Engineer Hill.

The accusations between the individuals continued, and the conflict continued to escalate during the summer and fall of 2010. In July 2010, Supervisor Steinmetz raised another safety concern through AEP's Employee Concerns Program, which raised the possibility that Ma was an unethical employee. In October 2010, Ma raised another safety concern through AEP's Employee Concerns program, claiming that Supervisor Steinmetz had inappropriately yelled at her as retaliation for her having written the May 2010 Condition Report. Tensions continued to rise, to a point where the employees were loath to even speak to one another. In the backdrop, some leadership changes took effect at AEP. In particular, in June 2010, Vice President Carlson and Director Ebright had taken over AEP's increasingly-fractured engineering organization.

On October 15, 2010, Vice President Carlson, Director Ebright, and HR Specialist Tiffany Rydwelski met with Ma. During the meeting, Ma discussed Engineer Hill's and Supervisor Steinmetz's inappropriate conduct and hostility towards her. Ma expressed that she felt that AEP had not properly dealt with this situation. From there, on October 22, 2010, Vice President Carlson met with Engineer Hill. Engineer Hill discussed what he felt was Ma's inappropriate and hostile conduct. He expressed that he felt that AEP had not properly dealt with this situation. According to Vice President Carlson, this series of meetings confirmed to him that the work environment at the Cook Power Plant required immediate improvement.

On November 2, 2010, Ma met with HR Specialist Rydwelski, Vice President Carlson, Supervisor Yu Shen, Manager Mickey Bellville, Engineer Hill, and Supervisor Steinmetz. According to Vice President Carlson, he attended the meeting with the goal of making his expectation known to everyone that all sides

of the interpersonal conflict needed to exhibit professionalism going forward. He stressed the need for each side to effectively communicate with each other and to treat each other with respect, and to put past feelings of resentment or anger behind them for the sake of the group. HR Specialist Rydwelski also testified that she raised her concerns about the interpersonal issues with Engineer Hill, Supervisor Steinmetz, and Ma, and stressed the need for everyone to engage in professional behavior.

Later that same day, Ma sent an email to her Manager, Yu Shen, with several others copied, including HR Specialist Rydwelski, in which Ma commented that she heard Engineer Hill was "smearing her reputation." HR Specialist Rydwelski testified that after reading the email, she believed Ma was continuing "to go down the behavioral path of, you know, us/them, win/lose, Greg Hill. It's not the cohesive collective teamwork we would like to see in an email." . . . Vice President Carlson felt that the tenor of Ma's email violated his direction. As a result, the following day, Vice President Carlson again met with Ma, and further warned her that continued noncompliance with his expectations would lead to discipline.

Despite the meetings, AEP senior management continued to feel that Ma was failing to act as a team player and therefore violating Vice President Carlson's directions. During December 2010, Ma was involved in additional interpersonal conflicts with other AEP employees, namely, ones concerning whether it was appropriate for AEP employees to call Ma over the weekend; these conflicts involved more emails sent by Ma that AEP's management found objectionable. In January 2011, Ma received a letter indicating that AEP's management believed that her workplace communications were unprofessional. The issue raised in the letter culminated in a meeting later that month.

On January 28, 2011, Director Ebright and HR Specialist Rydwelski again met with Ma to address the ongoing interpersonal problems between her and others, including Engineer Hill. HR Specialist Rydwelski testified that during the meeting, Ma described a hypothetical situation in which "Greg Hill kills my baby." HR Specialist Rydwelski testified that because Ma made that strange comment, she referred Ma to the AEP's Employee Assistance Program, which was designed to assist employees who had professional or interpersonal shortcomings and enable them to correct their behavior. As part of the Employee Assistance Program, Ma attended counseling sessions focused on developing her interpersonal skills.

In February 2011, the Employee Assistance Program required that Ma take a period of leave from AEP. Following this period of leave, Ma returned to work at AEP. On February 10, 2011, Director Ebright and HR Specialist Rydwelski again met with Ma. During this meeting, they again stressed the need for Ma to comply with the expectations set at earlier meetings. HR Specialist Rydwelski testified that for a period after Ma returned, she did not hear any negative reports about Ma's behavior. . . . However, HR Specialist Rydwelski

-4-

also testified that when she did discuss Ma's performance with others at a later time, her conclusion was that Ma had not corrected her behavior in the time following her experience in the Employee Assistance Program and her period of leave. . . .

Around this time, there were some personnel changes at AEP. Manager Shen, the engineer to whom Ma reported, left AEP to take a job in the Middle East. This meant that Ma began reporting to Manager Bellville. Manager Bellville now reported to Director Ebright. And Manager Ebright now reported to Vice President Carlson.

Also around this time, AEP tasked a group of engineers with finding a solution to certain "LOTIC2" errors concerning what the engineers termed a "LOCA" safety analysis. Ma, as well as her husband, was a member of this group. The engineers selected for the group were to identify the problem and offer various resolution proposals to solve the errors. This complicated nuclear-science issue involved many engineers over a period of several months. At first Ma led the group, but at some point, Manager Bellville, due to what he believed were flaws in Ma's leadership style, transferred the leadership of the group to Engineer John Zwolinski.

The process of fleshing out the issues concerning the "LOTIC2" errors culminated in the Spring and early Summer of 2011. By her account, Ma offered three resolution proposals. Senior management began to coalesce around one resolution proposal, which several engineers referred to as the "relay failure" proposal. The "relay failure" proposal was not one that Ma had suggested. Ma had reservations about the "relay failure" proposal because she believed that it was unsafe and would violate Nuclear Regulatory Commission requirements, and she raised some variant of those concerns with the other members of the team. Despite Ma's reservations, on June 3, 2011, Vice President Carlson announced that AEP would implement the "relay failure" proposal.

The parties disagree on how best to categorize Ma's behavior as a member of that group, her reluctance to embrace the "relay failure" proposal, and her eventual refusal to participate in the solution. Ma described her conduct as repeatedly raising her concern that the "relay failure" proposal was illegal or unsafe. In contrast, many others—including Plant Manager Shane Lies, Vice President Carlson, and the eventual leader of the group, Engineer Zwolinski—described Ma's conduct as being disagreeable and contrarian, and denied that Ma ever raised concerns of illegality. To be sure, Chief Nuclear Counsel and Regulatory Affairs Manager James Petro testified that if an AEP employee genuinely believed that a proposed solution was potentially illegal, AEP would accord the employee the right to not work on it. But AEP management, namely Vice President Carlson, viewed Ma's actions as rooted not in safety concerns, but insubordination. On June 13, 2011, several AEP employees—including Plant Manager Lies, Vice President Carlson, Director Ebright, and Chief Nuclear

Counsel Petro—met to discuss, and ultimately agreed with, Vice President Carlson's recommendation that Ma be fired from AEP.

On June 17, 2011, AEP terminated Ma's employment. Chief Nuclear Counsel Petro testified that Ma was terminated for a combination of insubordination and unresolved personal relationship issues within the workplace, which in his view "culminated in the refusal to work." . . . Director Ebright testified that the altercation "led me to the conclusion that the things we had been coaching, counseling, demonstrating, you know, fostering with Mary, the information that we had provided and the written warning where we met with her when she returned from the time away from the facility, . . . she had not followed through on her commitment to rehabilitate her behavior, and that basically it was destructive to our facility and consequential to our nuclear safety culture." . . . HR Specialist Rydwelski testified that "there was a recommendation of separation from the company because of her lack of working on a work product, which was a sign of continued behavior deficiency . . . . In my view there were behaviors that were exhibited by [Ma] that were not recoverable. She didn't internalize them." . . .

After Ma's employment was terminated, she raised her concern about the "relay failure" proposal directly with the Nuclear Regulatory Commission. In response to Ma's correspondence, the Nuclear Regulatory Commission conducted an investigation. Ultimately, the Nuclear Regulatory Commission did not find sufficient evidence to support Ma's claim that the "relay failure" proposal violated federal standards.[3]

In January 2013, Ma filed suit in federal district court, naming AEP, Ebright, and Carlson as defendants. Against AEP, Ma alleged that she was discharged as retaliation for her reports of safety concerns, a violation of 42 USC 5851(a).[4] Ma raised a claim of tortious interference with business relations, a claim brought under Michigan law,[5] against Ebright and Carlson. On June 17, 2013, AEP, Carlson, and Ebright filed a motion arguing that the court lacked jurisdiction over the statutory claim, an argument ultimately rejected by the court. The motion also asked that the district court refuse to exercise supplemental jurisdiction[6] over the tortious interference

---

[3] *Id*. at 959-962. In the letter written to Ma explaining the basis for her discharge, Ebright wrote, "Your continuing behavioral deficiencies and your failure to correct your performance is unacceptable. Based on your failure to improve and sustain your performance at an acceptable level, your employment is terminated effective today."

[4] Under this statute, "[n]o employer may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment because the employee . . . notified his employer of an alleged violation of this chapter or the Atomic Energy Act of 1954 (42 USC 2011 *et seq*.)[.]" 42 USC 5851(a)(1)(A).

[5] See, e.g., *Dalley v Dykema Gossett*, 287 Mich App 296; 788 NW2d 679 (2010).

[6] See 28 USC 1367.

claim. This particular argument was raised in response to the district court's request that the parties brief the issue.

The district court agreed that it should not exercise supplemental jurisdiction over the tortious interference claim, explaining:

> In the first place, the state-law claim introduces new party defendants, namely Defendants Carlson and Ebright. Neither of these defendants is a proper defendant on the sole federal claim, and their addition to the case for a purely state-law claim (on which the corporate defendant is not a proper party defendant) needlessly complicates the case. Second, the theory of state-law liability asserted is, at best, underdeveloped in Michigan law. Tortious interference claims are not novel in their own right, but their potential application to supervisors in a statutory employment discrimination case against the common employer of the plaintiff and the defendant supervisors raises a series of novel issues under Michigan common law. . . . Michigan courts—not federal courts—should lead the way in developing the parameters of any common law theory of liability against supervisors in the context of statutory employment law claims against an employer because common law developments have the potential to impinge on the prerogatives of the Michigan legislature in creating the parameters of the statutory claim. Finally, the federal statute at issue here does not create any claim against supervisors. . . . Rather, Congress created a claim solely against the corporate employer. Proceeding with a state common law tort against the supervisors risks eroding Congress' decision not to impose ERA liability on supervisors. Accordingly, the Court declines to exercise supplemental jurisdiction over Count III of Ma's complaint.

On June 17, 2014, Ma filed suit in Berrien Circuit Court against Weber, Carlson, Ebright, Hill, Bellville, and Steinmetz. Ma's complaint alleged that in 2004, she raised safety concerns regarding analyses performed by other workers, specifically Hill and Steinmetz. She alleged that these two men resented her for raising these concerns and retaliated against her by making false statements about her to others. The complaint explained that no disciplinary action was taken against Ma at that time because others at the company rewarded her for her actions and would not permit any disciplinary action against her. However, Ma's complaint alleged that in 2010, Weber, Carlson, and Ebright began "abetting and engaging in retaliation" against her as well. Ma alleged that her employment was eventually terminated "because she voiced her concerns about safety issues to the company and refused to sign off on reports to government regulatory agencies that she believed were false and intended to conceal serious unsafe, and thereby contrary to the interests of the Cook Plant, conditions at the plant." The complaint raised a single count of tortious interference with business relations against all six defendants.

In Ma's federal suit, a bench trial was held in November 2014.[7] The federal district court issued detailed findings of fact and conclusions of law on August 18, 2015.[8] The district court

---

[7] *Ma*, 123 F Supp 3d at 956.

concluded that Ma was discharged not as retaliation for her reports of safety violations, but "because of the interpersonal challenges that were plainly evident during the entirety of Ma's tenure at AEP."[9] The court explained that Ma "was unable or unwilling to work collaboratively as part of a team; she wanted to be an island of righteousness in her own world. . . . Ma did not effectively talk, collaborate, and otherwise work with many of her co-workers at the Cook Power Plant, and . . . it was this shortcoming that caused AEP to terminate her employment."[10] The court found Ma's theory of the case, that "there was some sort of conspiracy at AEP, and that her detractors long-intended to see her fired from the company[,]" was not supported by the evidence.[11]

After this ruling, defendants moved for summary disposition in Berrien Circuit Court. Among several arguments, defendants contended that there was no evidence that their actions were taken solely to further their own personal interests, with no benefit to AEP. The trial court declined to consider the federal district court's findings. However, the trial court granted the motion, concluding that Ma failed to present any evidence that would allow a jury to conclude that defendants were acting solely for their own benefit and without any benefit to AEP.

After the trial court granted the motion, defendants argued that Ma's complaint was frivolous and sought attorney fees pursuant to MCR 2.114 and MCL 600.2591. Defendants also sought certain deposition expenses as taxable costs. The trial court denied both requests.

## II. DOCKET NO. 330380

In Docket No. 330380, Ma challenges the trial court's order granting summary disposition in defendants' favor pursuant to MCR 2.116(C)(10). Albeit for reasons different than those explained by the trial court, we agree that defendants are entitled to summary disposition.

## A. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition.[12] As our Supreme Court has explained:

> A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. Where the proffered evidence fails to

---

[8] *Id*. at 955-967.

[9] *Id*. at 964.

[10] *Id*.

[11] *Id*. at 965.

[12] *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law.[13]

As is explained below, the lynchpin to our analysis is our application of the doctrine of collateral estoppel. We review de novo "issues concerning the application of the doctrine of collateral estoppel."[14]

## B. ANALYSIS

We begin by examining the theory of liability pleaded in Ma's complaint. As this Court has explained:

> The elements of tortious interference with a business relationship are the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff.[15]

It is also well established that "[t]o maintain a cause of action for tortious interference, the plaintiff must establish that the defendant was a 'third party' to the contract rather than an agent of one of the parties acting within the scope of its authority as an agent."[16] In this matter, all of the defendants are employed by AEP, a party to the business relationship at issue. Thus, it is incumbent on Ma to demonstrate that these individuals were not acting within the scope of their authority as employees. In this regard, it is "settled law that corporate agents are not liable for tortious interference with the corporation's contracts unless they acted solely for their own benefit with no benefit to the corporation."[17]

Ma's theory of the case is that defendants collaborated to effectuate her dismissal through false accusations of improper behavior in the workplace. Ma contends that the source of animosity and conflict at AEP was the fault of others. At its core, Ma's theory represents her interpretation of the ongoing interpersonal conflicts that existed during her tenure with AEP. But as the federal district court found, "Ma's personal interpretation is heartfelt, but wrong."[18] The federal court found that Ma indeed lacked the interpersonal skills necessary to function effectively in the workplace.[19] The court explained that "Ma's approach created an untenable

---

[13] *Id.* at 120.

[14] *Barrow v Pritchard*, 235 Mich App 478, 480; 597 NW2d 853 (1999).

[15] *Dalley*, 287 Mich App at 323 (quotation omitted).

[16] *Lawsuit Fin, LLC v Curry*, 261 Mich App 579, 593; 683 NW2d 233 (2004).

[17] *Reed v Mich Metro Girl Scout Council*, 201 Mich App 10, 13; 506 NW2d 231 (1993).

[18] *Ma*, 123 F Supp 3d at 964.

[19] *Id.*

situation for AEP's senior management, as the different groups of engineers could not work together to develop solutions to safety problems. . . . AEP's Senior Management had not only the right, but also the responsibility, to put this conflict to an end."[20]

When applied to Ma's tortious interference claim, these factual findings require dismissal. As explained, to prevail in this matter, Ma must be able to demonstrate that defendants were acting solely for their own benefit and with no benefit to the employer when they purportedly interfered with her employment relationship.[21] Ma attempts to do so by contending that her discharge was the result of false accusations levied against her regarding her interpersonal skills, motivated by a personal desire on the part of defendants to see her discharged. And if Ma were correct, perhaps one could conclude that defendants were acting solely for their own benefit in making these accusations. If it were true that Ma conducted herself properly in the workplace and that accusations to the contrary were false, the inference could be drawn that by making these accusations, defendants were acting for their own personal reasons, not to benefit AEP.[22] But as the federal district court found, Ma did, in fact, lack interpersonal skills.[23] The court explicitly found that Ma's theory—that there was a long-standing conspiracy of sorts aimed at effectuating her discharge—was "not supported by the evidence."[24] These findings preclude a conclusion that defendants were acting solely for their own benefit.

The district court's findings also foreclose liability for a second reason. Ma bears the burden of establishing that defendants' allegedly tortious conduct caused the termination of her employment relationship.[25] To establish causation, Ma would be required to demonstrate that

---

[20] *Id.* at 965.

[21] *Reed*, 201 Mich App at 13.

[22] In the trial court, Ma contended that she did not "have to prove exactly what [d]efendants' personal interest was." She then hypothesized various reasons why each defendant may have been motivated to interfere with her employment relationship. Defendants contend that this is an admission that Ma cannot establish that they acted solely in furtherance of their personal interests. We do not necessarily take the same view. Clearly, Ma must demonstrate that defendants were acting "solely for their own benefit with no benefit to the corporation." *Id.* But acting solely for one's own benefit and acting with no benefit to the corporation are two sides to the same coin. Had Ma been able to demonstrate that defendants were acting without any benefit to the corporation, a rational fact-finder could have also concluded that they were acting for solely personal reasons, even if those precise reasons were not known. We are of the opinion that Ma is, in that sense, correct in stating that it is not necessary to prove the precise personal interest of each defendant.

[23] *Ma*, 123 F Supp 3d at 964.

[24] *Id.* at 965.

[25] *Dalley*, 287 Mich App at 323.

defendants' conduct was a proximate cause of her damages.[26] Proximate cause requires proof of two elements: "(1) cause in fact, and (2) legal cause."[27] "The cause in fact element generally requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred."[28] The federal district court's factual findings conclusively demonstrate that the harm suffered by Ma—the termination of her employment relationship with AEP—was not caused by a purported conspiracy or collaborative effort by defendants to push her out of the company. Rather, AEP terminated her employment because of her inability to effectively communicate and work with others. These findings preclude Ma from establishing that but for any purportedly tortious conduct by defendants, she would have remained employed with AEP.

The remaining question, then, is whether the federal district court's factual findings must be given preclusive effect in this matter. As this Court has explained:

> Collateral estoppel precludes relitigation of an issue in a subsequent, different cause of action between the same parties when the prior proceeding culminated in a valid final judgment and the issue was actually and necessarily determined in that prior proceeding. Collateral estoppel is a flexible rule intended to relieve parties of multiple litigation, conserve judicial resources, and encourage reliance on adjudication.
>
> Generally, application of collateral estoppel requires (1) that a question of fact essential to the judgment was actually litigated and determined by a valid and final judgment, (2) that the same parties had a full and fair opportunity to litigate the issue, and (3) mutuality of estoppel.[29]

This Court has explained that before collateral estoppel may be applied, "the ultimate issue to be concluded must be the same as that involved in the first action."[30] "The issues must be identical, and not merely similar."[31] Ultimately, the dispositive issue in the federal case was whether Ma's discharge was the result of retaliation due to her reports of suspected safety concerns, "or because of her continued pattern of interpersonal and professional shortfalls[.]"[32]

---

[26] *Alar v Mercy Mem Hosp*, 208 Mich App 518, 530; 529 NW2d 318 (1995) (explaining that with regard to "all purportedly tortious conduct," an actionable claim requires proof of proximate causation).

[27] *Id*.

[28] *Skinner v Square D Co*, 445 Mich 153, 163; 516 NW2d 475 (1994), overruled in part on other grounds by *Smith v Globe Life Ins Co*, 460 Mich 446, 455 n 2; 597 NW2d 28 (1999).

[29] *Rental Props Owners Ass'n of Kent Co v Kent Co Treasurer*, 308 Mich App 498, 529; 866 NW2d 817 (2014) (citations omitted).

[30] *Id*.

[31] *Id*.

[32] *Ma*, 123 F Supp 3d at 964.

In this matter, the very same question is at issue. Ma's theory is that she was discharged not due to a lack of interpersonal skills, but because defendants sought to retaliate against her due to her reports of safety concerns. Distilling the matter further, the relevant factual findings are that the accusations against Ma were true, and that her termination indeed resulted from her lack of interpersonal skills, not a nefarious collaborative effort against her. These are precisely the same findings that foreclose Ma's theory of liability in the instant matter.

It is clear that the issue was litigated and determined by the federal district court. "To be actually litigated, a question must be put into issue by the pleadings, submitted to the trier of fact, and determined by the trier."[33] Clearly, the cause of Ma's discharge was put into issue by her federal complaint. Because of the nature of the statutory claim raised by Ma, the trial court was required to address whether she would have been discharged absent any engagement in protected activities, such as her reports of safety concerns.[34] This, in turn, required the federal district court to determine the reason for her discharge.[35] After considering the evidence and arguments presented by the parties, the court found that Ma was terminated "because of the interpersonal challenges that were plainly evident during the entirety of Ma's tenure at AEP."[36] The reason for Ma's discharge was a question put into issue by the pleadings, submitted to the trier of fact, and determined by that trier. Thus, the issue of the reason for Ma's discharge was actually litigated in the federal district court. It is equally clear that the trial court's determination was essential to the judgment. Simply put, the federal court could not have resolved the matter without determining the reasons for Ma's discharge. That was the core issue to be determined in that matter.[37]

---

[33] *Rental Props*, 308 Mich App at 529.

[34] *Ma*, 123 F Supp 3d at 962.

[35] *Id*. at 964.

[36] *Id*.

[37] Ma contends that the district court's finding regarding the true reason for her discharge was not, in fact, necessary to that court's decision. Ma argues that AEP needed only demonstrate that her discharge was not caused by her protected activities; she claims that it was not also necessary to prove the actual cause of her discharge. This is an incorrect statement of the law, a fact of which Ma seems aware. As the Sixth Circuit Court of Appeals explained in its decision affirming the federal district court's ruling in Ma's federal case:

> Ma challenges the district court's conclusion that AEP met its burden, maintaining that because only a subset of the senior management team testified, it was impossible for the court to discern AEP's true reason for terminating her. *Although she aptly notes that an employer must present evidence of its actual rather than hypothetical motivations*, see Passaic Valley Sewerage Comm'rs v. U.S. Dep't of Labor, 992 F.2d 474, 482 (3d Cir. 1993), Ma points to no authority necessitating that all decisionmakers testify. Instead, *the statute requires AEP provide "clear and convincing" evidence of its motivations. See* 42 U.S.C. §

-12-

Ma also had a full and fair opportunity to litigate the issue in the federal district court. As explained, the question of the reason for her discharge was put into issue due to the nature of the claim asserted by Ma. She was afforded a lengthy bench trial, where she was free to present testimony and evidence regarding the issue. Under these circumstances, Ma was clearly given a full and fair opportunity to litigate the cause of her termination.

The trial court declined to consider the federal district court's decision, reasoning that the defendants in that action were not the same defendants named in Ma's circuit court case. The trial court's reasoning was incorrect. Defendants assert collateral estoppel defensively, and our Supreme Court has held that mutuality of estoppel is not required when the doctrine is asserted defensively.[38] This means that where a plaintiff has had the full and fair opportunity to litigate an issue, if that issue is decided against that plaintiff, he or she may not relitigate the very same issue, whether against the same or different defendants.[39] Thus, it is irrelevant that the federal matter did not involve the same defendants as Ma's circuit court case.

That said, we agree that the doctrine could not have been properly asserted at the summary disposition phase. This is because it was not until after Ma filed the present appeal that she exhausted all avenues of appellate review of the federal district court's decision. Until all appellate review was exhausted, the federal district court's decision was not final, and thus, could not be given preclusive effect.[40] But at this point, the federal district court's decision has been affirmed by the Sixth Circuit Court of Appeals,[41] and the United States Supreme Court has denied Ma's petition seeking a writ of certiorari.[42] Thus, the decision is now final. There are no barriers to the application of collateral estoppel in this case.

Ma contends that "the determination of whether collateral estoppel should be applied is whether doing so would result in substantial justice." She then argues that, for various reasons, substantial justice would not be served by the application of collateral estoppel. Ma derives such a rule from our Supreme Court's decision in *Monat v State Farm*.[43] The principal holding of *Monat* is that where collateral estoppel is asserted defensively, mutuality of estoppel is not

---

5851(b)(3)(B). [*Ma v American Elec Power, Inc*, 647 Fed App'x 641, 644 (CA 6, 2016) (emphasis supplied).]

[38] *Monat v State Farm Ins Co*, 469 Mich 679, 695; 677 NW2d 843 (2004).

[39] *Id*. at 692 ("A party is entitled to his day in court on a particular issue, and is not entitled to his day in court against a particular adversary").

[40] *Leahy v Orion Twp*, 269 Mich App 527, 530; 711 NW2d 438 (2006) ("A decision is final when all appeals have been exhausted or when the time available for an appeal has passed").

[41] *Ma*, 647 Fed App'x 641.

[42] *Ma v American Electric Power, Inc*, ___ US ___; 137 S Ct 242; 196 L Ed 2d 135 (2016).

[43] *Monat*, 469 Mich 679.

required.[44]  In explaining its rationale for adopting this rule (and responding to the dissent), the Court stated:

> Further, the dissent, at least in part, apparently bases its position on the notion that fairness, in the context of defensive collateral estoppel, is determined only on the basis of symmetry. . . . However, as explained in *Bruszewski v United States*, 181 F2d 419 (CA3, 1950), the achievement of "substantial justice," rather than symmetry, is the proper measure of fairness in the context of defensive collateral estoppel:
>
> > This second effort to prove negligence is comprehended by the generally accepted precept that a party who has had one fair and full opportunity to prove a claim and has failed in that effort, should not be permitted to go to trial on the merits of that claim a second time.  Both orderliness and reasonable time saving judicial administration require that this be so unless some overriding consideration of fairness to a litigant dictates a different result in the circumstances of a particular case.
> >
> > The countervailing consideration urged here is lack of mutuality of estoppel.  In the present suit [the plaintiff] would not have been permitted to take advantage of an earlier affirmative finding of negligence, had such finding been made in [his first suit against a different defendant].  For that reason he urges that he should not be bound by a contrary finding in that case.  But a finding of negligence in [the plaintiff's first suit] would not have been binding against the [defendant in a second suit] because [that defendant] had no opportunity to contest the issue there.  The finding of no negligence on the other hand was made after full opportunity to [the plaintiff] on his own election to prove the very matter which he now urges a second time.  Thus, no unfairness results here from estoppel which is not mutual.  In reality the argument of [the plaintiff] is merely that the application of res judicata in this case makes the law asymmetrical.  But the achievement of substantial justice rather than symmetry is the measure of the fairness of the rules of res judicata. [*Id*. at 421.][45]

Simply put, our Supreme Court did not adopt an overriding rule that to apply collateral estoppel, "substantial justice" must also be established.  Rather, the Court explained that when evaluating whether it is fair to permit the defensive use of collateral estoppel without mutuality, the primary concern is substantial justice, not symmetry.  Our Supreme Court found that where a

---

[44] *Id*. at 695.

[45] *Monat*, 469 Mich at 693-694 (alterations in original).

-14-

plaintiff has had the full and fair opportunity to litigate an issue once, the application of collateral estoppel against that plaintiff in a suit involving a different defendant best achieves "substantial justice," and thus, is fair.[46] Ma was afforded such an opportunity, and is not entitled to a second bite at the proverbial apple in this suit.

Even if "substantial justice" were a controlling standard, we would not find Ma's arguments availing. Ma essentially contends that defendants caused her suit to be split between two courts. She thus assigns the responsibility for any duplicative judicial efforts to defendants alone. Ma's argument focuses on the fact that in the federal case, Ebright and Carlson argued against the exercise of supplemental jurisdiction. She contends that these individuals vociferously argued for the dismissal of the tort claim on the basis that it bore no relationship to the federal statutory claim. She also discusses at length the fact that defendants in this matter did not seek to join the case with the federal suit under FR Civ P 20, which allows for the permissive joinder of claims.

We are not persuaded. It is clear that with respect to the exercise of supplemental jurisdiction, the district court requested briefing on the issue from the parties. Thus, it is not entirely fair to view this as a situation where Ebright and Carlson forcefully sought to have the claim against them dismissed by the federal district court. Nor did these individuals contend that the two counts were entirely unrelated as a factual matter; rather, they explicitly acknowledged that the claims arose from the same set of operative facts.[47] And in any event, it is clear that the basis for the district court's decision not to assume supplemental jurisdiction over the tortious interference claim had little, if anything, to do with the relatedness of the facts underlying the two claims. This is not surprising, given that Ma's federal complaint relied on the exact same factual allegations to support each count. Finally, we can hardly fault defendants for failing to seek joinder under FR Civ P 20 when the district court had already expressed an unwillingness to assume supplemental jurisdiction over the very same claim.[48]

In sum, the federal district court's findings regarding the cause of Ma's discharge must be given preclusive effect. Those findings necessitate a conclusion that defendants were not acting solely for their own benefit, and also establish that Ma's termination was not caused by defendants' actions. Accordingly, summary disposition must be entered in defendants' favor.

---

[46] *Id.*

[47] The defendants in the federal matter did contend that the statutory claim and state law claim served different purposes, and thus, had "no community" with one another, a phrase frequently quoted by Ma in her supplemental brief on appeal. A fair reading of the brief filed in federal court makes it clear that those defendants were referring to the legal elements of the two claims, not the factual allegations that Ma relied on to support each claim.

[48] See *Sunpoint Securities, Inc v Porta*, 192 FRD 716, 719 (MD Fl, 2000) (explaining that FR Civ P 20 is "procedural only and does not affect jurisdictional requirements.").

In Docket No. 332462, defendants appeal as of right from the trial court's order denying their motion for attorney fees pursuant to MCR 2.114 and for the taxation of certain costs pursuant to MCR 2.625(F). Finding no errors warranting relief, we affirm the trial court's order.

## A. ATTORNEY FEES

Defendants contend that the trial court abused its discretion when it refused to award attorney fees pursuant to MCR 2.114 and MCL 600.2591. We disagree. A trial court's ruling on a motion for costs and attorney fees is reviewed for an abuse of discretion.[49] "An abuse of discretion occurs when the decision results in an outcome falling outside the range of principled outcomes."[50] To the extent the trial court's decision involves factual findings, those findings are reviewed for clear error.[51] "Clear error signifies a decision that strikes [the reviewing court] as more than just maybe or probably wrong."[52] A factual finding is clearly erroneous if, despite the existence of evidence supporting the finding, the reviewing court, after reviewing the entire record, is left with a definite and firm conviction that a mistake has been made.[53]

In their motion, defendants argued that attorney fees were warranted under MCR 2.114. This court rule provides that the signature of an attorney or party constitutes a certification by the signer that:

> (1) he or she has read the document;
>
> (2) to the best of his or her knowledge, information, and belief formed after reasonable inquiry, the document is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law; and
>
> (3) the document is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.[54]

Pursuant to MCR 2.114(E), if a document is signed in violation of these requirements, the trial court "shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay the other party or parties the amount of the

---

[49] *Keinz v Keinz*, 290 Mich App 137, 141; 799 NW2d 576 (2010).

[50] *Id.*

[51] *Id.*

[52] *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009).

[53] *Id.*

[54] MCR 2.114(D).

reasonable expenses incurred because of the filing of the document, including reasonable attorney fees."

Statutory authority also provides a basis for awarding attorney fees and other costs. Pursuant to MCL 600.2591:

(1) Upon motion of any party, if a court finds that a civil action or defense to a civil action was frivolous, the court that conducts the civil action shall award to the prevailing party the costs and fees incurred by that party in connection with the civil action by assessing the costs and fees against the nonprevailing party and their attorney.

(2) The amount of costs and fees awarded under this section shall include all reasonable costs actually incurred by the prevailing party and any costs allowed by law or by court rule, including court costs and reasonable attorney fees.

(3) As used in this section:

(a) "Frivolous" means that at least 1 of the following conditions is met:

(*i*) The party's primary purpose in initiating the action or asserting the defense was to harass, embarrass, or injure the prevailing party.

(*ii*) The party had no reasonable basis to believe that the facts underlying that party's legal position were in fact true.

(iii) The party's legal position was devoid of arguable legal merit.

(b) "Prevailing party" means a party who wins on the entire record.

Defendants' arguments are all derived from the filing of Ma's complaint. Defendants argue (1) that the complaint was not well-grounded in fact and law because Ma lacked any reasonable basis for claiming that defendants were third parties to the business relationship; (2) that the complaint was not well-grounded in fact or law because her allegations that defendants acted tortuously were false and unsupported, and (3) that Ma filed her complaint for an improper purpose. We address each argument in turn.

### 1.  "THIRD PARTY" ISSUE

This Court extensively addressed MCL 600.2591 in *Louya v William Beaumont Hosp*.[55] In *Louya*, this Court explained that to determine if a suit is frivolous under MCL 600.2591, "it is necessary to determine whether there was a reasonable basis to believe that the facts supporting the claim were true *at the time the lawsuit was filed* . . . ."[56]  This Court stated, "There is a

---

[55] *Louya v William Beaumont Hosp*, 190 Mich App 151; 475 NW2d 434 (1991).

[56] *Id*. at 162.

significant difference between bringing a lawsuit with no basis in law or fact at the outset and failing to present sufficient evidence to justify relief at trial."[57]  This Court went on to explain:

> Furthermore, the mere fact that the attorney may doubt the possibility of success on the merits of a case, even at the outset of litigation, does not necessarily and logically lead to a conclusion that the claim is "frivolous" as defined by MCL 600.2591(3)(a)(ii); MSA 27A.2591(3)(a)(ii).  Rule 3.1 of the Michigan Rules of Professional Conduct prohibits an attorney from instituting or defending a frivolous action.  However, the comment to the rule also provides:
>
> > The filing of an action or defense or similar action taken for a client is not frivolous merely because the facts have not first been fully substantiated or because the lawyer expects to develop vital evidence only by discovery.  *Such action is not frivolous even though the lawyer believes that the client's position ultimately will not prevail.*  [Emphasis added.]
>
> In our view, the statute at issue and the rules of professional conduct should be read in harmony, if possible, to avoid the anomalous result of holding a lawyer personally liable for an opponent's costs and attorney fees after ethically representing a client's interest.
>
> * * *
>
> We will not construe MCL 600.2591; MSA 27A.2591 in a manner that has a chilling effect on advocacy or prevents the filing of all but the most clear-cut cases.  Nor will we construe the statute in a manner that prevents a party from bringing a difficult case or asserting a novel defense, or penalizes a party whose claim initially appears viable but later becomes unpersuasive.  Moreover, an attorney or party should not be dissuaded from disposing of an initially sound case which becomes less meritorious as it develops because they fear the penalty of attorney fees and costs under this statute.
>
> In this case, the court's failure to focus its inquiry on what [counsel] reasonably believed at the time he commenced the case is of critical importance.  The statutory scheme is designed to sanction attorneys and litigants who file lawsuits or defenses without reasonable inquiry into the factual basis of a claim or defense, not to discipline those whose cases are complex or face an "uphill fight."  The ultimate outcome of the case does not necessarily determine the issue of frivolousness.[58]

---

[57] *Id.*

[58] *Id.* at 162-164.

While *Louya* specifically addressed MCL 600.2591, we find its analysis equally applicable to defendants' arguments under MCR 2.114, because in this case, the document purportedly signed in violation of MCR 2.114 is Ma's complaint. Whether considered under the statute or the court rule, the ultimate issue is the same: was the complaint frivolous when it was filed because it was not well-grounded in fact or law?

Like the trial court, we conclude it was not. Defendants argue that Ma had no basis, either factually or legally, to believe that they were acting solely for their own benefit and without any benefit to AEP. What is clear in this matter is that Ma has a different view of her relationships with her former coworkers. Both in this case and in her federal suit, Ma believed that her conduct was appropriate, and it was the conduct of others that caused the interpersonal conflicts at AEP. Given this belief, her allegations that defendants lied about her conduct were not baseless. Rather, she appears to have had an honest belief that others were collaborating to effectuate her discharge from AEP due to her reports of safety concerns. As the federal district court explained, "Ma's personal interpretation is heartfelt, but wrong."[59] This, however, does not render her complaint frivolous. That Ma was unable to prove her interpretation to be correct does not mean that the complaint was frivolous from the beginning.[60]

The remaining question is whether Ma's complaint was devoid of any arguable legal merit. Again, we agree with the trial court, and conclude it was not. Had Ma been able to prove that the accusations against her were false, and that indeed, others were collaborating against her to effectuate her discharge, a rational fact finder may well have concluded that defendants were acting solely for their own benefit, not for the benefit of AEP. Again, that Ma was unable to prove her case does not render the complaint frivolous.[61]

## 2. TORTUOUS ACTS

Defendants next contend that Ma had no reasonable basis to believe that they acted "both intentionally and either improperly or without justification[,]" a showing which is necessary to prevail on a claim of intentional interference with business relations.[62] Defendants essentially argue that Ma had no reasonable factual basis to claim that they lied about her conduct. As explained, Ma did not believe her conduct was inappropriate. Thus, when faced with accusations that she was acting inappropriately, Ma made an entirely logical inference that those making the accusations were lying. Again, Ma's interpretation of the facts was eventually found to be

---

[59] *Ma*, 123 F Supp 3d at 964.

[60] See *Kitchen v Kitchen*, 465 Mich 654, 662; 641 NW2d 245 (2002) (explaining that a complaint is not frivolous merely because it ultimately did not succeed).

[61] *Id*.

[62] *Dalley*, 287 Mich App at 323.

untrue. But it took a federal trial to reach that conclusion.[63] Once again, that Ma was ultimately unable to prove her case does not demonstrate that her complaint was frivolous when filed.[64]

### 3. IMPROPER PURPOSE

Finally, defendants contend that Ma brought her suit for an improper purpose under MCL 600.2591(3)(a)(*i*), which defines as frivolous any suit initiated for the primary purpose of harassing, embarrassing, or injuring the prevailing party. Defendants contend that this suit was "simply an extension of the contempt [Ma] had for coworkers who disagreed with her." The trial court disagreed, and we can discern no error in that conclusion. Clearly, Ma's relationships with coworkers were strained and difficult. But as explained before, it appears that Ma believed that she was not the source of the problem. Ma was proven incorrect in this regard. But while Ma did not prevail, we will not assume, as do defendants, that this litigation was no more than an extension of her apparent problems working with others. Rather, like the federal district court, we believe Ma's interpretation of the circumstances, although ultimately incorrect, was "heartfelt,"[65] and that the instant suit was undertaken in a good-faith effort to vindicate her beliefs. Because defendants have failed to demonstrate that the complaint was frivolous, the trial court correctly refused to award sanctions.

### B. TAXATION OF COSTS

Defendants contend that the trial court erred when it rejected their request to tax costs of $8,188.70, which represented the costs defendants incurred to procure deposition transcripts in this matter, as well as incidental costs incurred with regard to Ma's deposition. We disagree. "This Court reviews for an abuse of discretion a trial court's ruling on a motion for costs pursuant to MCR 2.625."[66] Whether a particular expense may be taxed as a cost is a question of law, reviewed de novo on appeal.[67]

Under Michigan's court rules, "[c]osts will be allowed to the prevailing party in an action, unless prohibited by statute or by these rules or unless the court directs otherwise, for

---

[63] We note that the district court denied a motion for summary judgment brought pursuant to FR Civ P 56, the federal rule of civil procedure that parallels MCR 2.116(C)(10). In denying the motion, the court explained that from the evidence presented, one of two inferences could be made: (1) Ma was terminated due to "[s]ome combination of insubordination and inability to get along with other people," or (2) that she was discharged as retaliation for reporting various safety concerns. In other words, even the federal district court that eventually ruled against Ma found that there was at least some potential merit to her factual allegations.

[64] *Kitchen*, 465 Mich at 662.

[65] *Ma*, 123 F Supp 3d at 964.

[66] *Van Elslander v Thomas Sebold & Assoc, Inc*, 297 Mich App 204, 211; 823 NW2d 843 (2012).

[67] *Id*.

reasons stated in writing and filed in the action."[68]   But "[t]he power to tax costs is purely statutory, and the prevailing party cannot recover such expenses absent statutory authority."[69] Thus, the presumption in civil cases is that costs will be allowed as a matter of course.[70]   But not all expenses may be taxed.[71]   This is because the term "costs" must be understood through statutory provisions that define what items are taxable as costs.[72]

One particular statute, MCL 600.2549, permits the taxation of deposition fees:

Reasonable and actual fees paid for depositions of witnesses filed in any clerk's office and for the certified copies of documents or papers recorded or filed in any public office shall be allowed in the taxation of costs only if, at the trial or when damages were assessed, the depositions were read in evidence, except for impeachment purposes, or the documents or papers were necessarily used.

A plain reading of the statute reveals that it concerns two distinct items: depositions and "documents or papers."   With regard to the taxation of fees associated with these items, the statute explains that costs may be taxed "*only if, at the trial or when damages were assessed*, the *depositions* were read into evidence, except for impeachment purposes, or the *documents or papers* were necessarily used."[73]

In *Portelli v I R Const Prods Co, Inc*, this Court addressed whether certain costs for depositions were taxable under MCL 600.2529 where the matter was decided at the summary disposition phase, rather than at trial:

Costs for depositions are expressly taxable pursuant to MCL 600.2549; MSA 27A.2549.   The plain language of the statute states that such costs are recoverable where the deposition is "read in evidence" at trial or where it is "necessarily used."   MCL 600.2549; MSA 27A.2549.   Here, excerpts of the deposition transcripts of Irving Rozian, James Williams, Michael Pruess, and plaintiff were necessarily used in the context of I.R. Construction's motion for summary disposition.[74]

Thus, the *Portelli* Court seemed to hold that when deposition transcripts are relied upon to support a summary disposition motion, those transcripts are "necessarily used," and thus, costs

---

[68] MCR 2.625(A)(1).  See also *Van Elslander*, 297 Mich App at 216.

[69] *Van Elslander*, 297 Mich App at 216 (citation omitted).

[70] *Id*.

[71] *Id*.

[72] *Id*.

[73] MCL 600.2549 (emphasis supplied).

[74] *Portelli v I R Const Prods Co, Inc*, 218 Mich App 591, 605; 554 NW2d 591 (1996).

associated with those depositions are taxable, assuming other requirements of the statute are satisfied. However, in *Portelli*, this Court ultimately determined that the deposition costs at issue were *not* taxable, for the reason that the deposition transcripts were never filed in any clerk's office.[75] Accordingly, this Court's holding that transcripts used to support a summary disposition motion satisfy the "necessarily used" component of the statute is obiter dictum and need not be followed.[76]

Like the trial court, we believe that *Portelli* misread the statute at issue. As explained, MCL 600.2549 differentiates between depositions and "documents or papers." The "necessarily used" language of the statute clearly applies only to the latter category, "documents and papers."[77] With regard to depositions, the statute provides that the taxation of costs is permitted "only if, at trial or when damages were assessed, the depositions were read in evidence, except for impeachment purposes . . . ."[78] Here, the depositions were never read into evidence. Accordingly, the only statutory authority relied on by defendants for the taxation of these costs does not permit the costs to be taxed. The trial court properly rejected defendants' request.

Affirmed.

/s/ Michael F. Gadola
/s/ Michael J. Talbot
/s/ Elizabeth L. Gleicher

---

[75] *Id*. at 606-607.

[76] See *Griswold Props, LLC v Lexington Ins Co*, 276 Mich App 551, 558; 741 NW2d 549 (2007) (explaining that statements in opinions concerning principles of law not essential to the judgment are obiter dictum and do not establish binding precedent).

[77] MCL 600.2549.

[78] MCL 600.2549.